# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 12, 2005

Decided July 15, 2005
Reissued September 1, 2005

No. 04-5352

CHRISTOPHER SHAYS AND
MARTIN MEEHAN,
APPELLEES

v.

FEDERAL ELECTION COMMISSION,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01984)

---

*David B. Kolker*, Attorney, Federal Election Commission, argued the cause for appellant. With him on the briefs were *Richard B. Bader*, Associate General Counsel, and *Vivien Clair*, *Erin K. Monaghan*, and *Harry J. Summers*, Attorneys.

*Charles G. Curtis, Jr.* argued the cause for appellees. With him on the brief were *Michelle M. Umberger*, *David L. Anstaett*, *Brent N. Rushforth*, *Carl S. Nadler*, *Shahid A. Buttar*, *Roger M. Witten*, *Randolph D. Moss*, *Donald J. Simon*, and *Fred Wertheimer*.

*Trevor Potter* was on the brief for *amici curiae* John McCain, et al. in support of appellees.

Before: EDWARDS, HENDERSON, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: A landmark reform to the nation's campaign finance laws, the Bipartisan Campaign Finance Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81, took aim at two perceived demons of federal electoral contests: "soft money," i.e., use of unregulated political party activities to influence federal elections, and "sham issue ads," i.e., ostensibly issue-related advocacy functioning in practice as unregulated campaign advertising. These two tactics, given broad scope by permissive Federal Election Commission rulings, infused federal campaigns with hundreds of millions of dollars in federally unregulated funds, much of it contributed by corporations and labor unions. Now BCRA's House sponsors (joined by Senate sponsors as amici) claim the FEC has undone their hard work, resurrecting in its regulations practices BCRA eradicated and thus forcing them to seek reelection in illegally constituted electoral contests. Considering this facial challenge to the regulations, the district court invalidated some fifteen rules, finding some inconsistent with the statute and others arbitrary and capricious. The FEC appeals regarding five key rules: standards for "coordinated communication," definitions of the terms "solicit" and "direct," the interpretation of "electioneering communication," allocation rules for state party employee salaries, and a de minimis exemption from allocation rules governing certain contributions, known as "Levin funds," to state and local parties. We affirm in all respects.

**I.**

Needless to say, federal campaign finance law is complex, and BCRA is no exception. Though few of its details are important to this litigation (and those that are we describe later in our analysis), we here provide a brief overview of the statute's background and objectives.

As the Supreme Court explained in *McConnell v. FEC*, 540 U.S. 93 (2003), which upheld BCRA's core provisions against constitutional challenge, "BCRA is the most recent federal enactment designed 'to purge national politics of what was conceived to be the pernicious influence of "big money" campaign contributions.'" *Id.* at 115 (quoting *United States v. Auto. Workers*, 352 U.S. 567, 572 (1957)). Even before BCRA, federal campaign finance laws, including the Federal Election Campaign Act of 1971 ("FECA"), Pub. L. 92-225, 86 Stat. 3, and amendments to that statute, restricted campaign "contributions," defined as "any gift, subscription, loan, advance, or deposit of money or anything of value made . . . for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). Individuals could contribute to federal candidates and their campaigns only within strict dollar limits, 2 U.S.C. § 441a(a), and corporations and labor unions could not contribute at all (though they could sponsor special political funds known as "political action committees" or "PACs"), *id.* §§ 441b(a), (b)(2)(C). *See McConnell*, 540 U.S. at 117-19. FECA also restricted "expenditures," i.e., "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made . . . for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(9)(A)(i). *See McConnell*, 540 U.S. at 118-19.

Although in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court upheld FECA's contribution limitations as well as various reporting and disclosure requirements, the Court invalidated expenditure limits for

individual donors, candidates, and campaigns. *See id.* at 143-44. (Though unchallenged in *Buckley*, FECA also codified a pre-existing ban on election-related spending by corporations and unions. *See* 2 U.S.C. § 441b; *McConnell*, 540 U.S. at 116-17, 122; *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 247-48 (1986).) In addition, invoking constitutional avoidance, the *Buckley* Court construed the term "expenditure" to cover communications only where they "advocate the election or defeat of a clearly identified candidate for federal office," and do so using "express terms" such as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" 424 U.S. at 43-44 & n.52.

In the political world, several terms of art emerged to describe the boundaries of this pre-BCRA law—terms we shall use throughout this opinion. Most important, contributions subject to federal source, amount, and disclosure requirements are called "hard money" or "federal money." *See McConnell*, 540 U.S. at 122. Funds outside FECA's sphere are called "nonfederal" or "soft." *See id.* at 122-23. Due to its reliance on specific phrases like "vote for" and "vote against," the express advocacy standard became known as the "magic words" test. *See id.* at 126.

Because FECA defined both "contribution" and "expenditure" in terms of the "purpose of influencing any election for *federal* office," *see* 2 U.S.C. §§ 431(8)(A), (9)(A) (emphasis added), donations aimed at state and local elections were unregulated, i.e., "soft." Thus, as *McConnell* explains, "questions arose concerning the treatment of contributions intended to influence both federal and state elections." 540 U.S. at 123. Charged with administering federal campaign finance laws, the Federal Election Commission ("FEC") took a permissive view. "Although a literal reading of FECA's definition of 'contribution' would have required funding such activities with hard money, the FEC ruled that political parties

could fund mixed-purpose activities—including get-out-the-vote drives and generic party advertising—in part with soft money." *Id.* Parties had to allocate such costs between hard and soft accounts, but rules in place after 1990 allowed national parties to fund as much as 35-40% of their mixed-purpose activities with soft money. *Id.* at 123 n.7. Even more generous, rules for state and local party organizations allowed allocation based on the ratio of federal to nonfederal offices on a given ballot, "which in practice meant that they could expend a substantially greater proportion of soft money than national parties to fund mixed-purpose activities." *Id.*

Over time, political parties took increasing advantage of these soft money opportunities. Although the two major parties spent only $21.6 million in soft money in the 1984 election cycle, by 2000 that figure had risen to $498 million—roughly 42% of their total spending. *Id.* at 124. Because this "soft" money fell outside FECA's contribution limitations, parties could raise it in massive dollops from single contributors, including corporations and unions. *See id.* at 124-25. Though federal candidates often played a key role in raising these funds, the parties shifted much of their soft money ($280 million in 2000) to the state level, where the FEC's more generous state-party allocation rules applied, and where certain disclosure regulations applicable to national parties did not. *See id.* at 124-26; *McConnell v. FEC*, 251 F. Supp. 2d 176, 198-99 (D.D.C. 2003) (per curiam) (decision of three-judge district court).

Just as soft money spending was exploding, a related phenomenon, "sham issue ads," also developed. The term "issue ad" derives from *Buckley*'s "magic words" construction of FECA, the idea being that express advocacy relates to candidates whereas non-express advocacy relates to "issues." *See McConnell*, 540 U.S. at 126. However "neat in theory," this distinction proved meaningless in practice—hence the "sham." *See id.* at 126-27. Free to mention candidates by name and even

discuss their views and voting records, those financing non-express advocacy could generate ads "functionally identical" to campaign ads, notwithstanding the absence of "magic words." *See id.* at 126. "Little difference existed, for example, between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think,'" *id.* at 126-27, a ruse employed in many ostensibly issue-oriented ads, *see McConnell*, 251 F. Supp. 2d at 301 (Henderson, J., concurring in the judgment in part and dissenting in part). Indeed, the record in the *McConnell* litigation showed that even when permitted to employ express advocacy, advertisers typically used more indirect language. *See McConnell*, 540 U.S. at 127 & n.18.

Beginning in about 1996, corporations and unions—both barred from direct contributions and expenditures, *see* 2 U.S.C. § 441b(a), but permitted to finance non-express advocacy under the "magic words" construal of "expenditure," *see Mass. Citizens for Life, Inc.*, 479 U.S. at 249—began spending large sums on such issue advertising. *See McConnell*, 540 U.S. at 127-28; *McConnell*, 251 F. Supp. 2d at 201. Apparently negligible before that point, such spending climbed to hundreds of millions of dollars by 2000. *McConnell*, 540 U.S. at 127; *McConnell*, 251 F. Supp. 2d at 201. The FEC, compounding the problem, construed "expenditure" to mean "magic words" for political parties, too, thus freeing them to spend their soft money war chests on still more sham issue advertising. *McConnell*, 540 U.S. at 123-24; *McConnell*, 251 F. Supp. 2d at 199 & n.14.

Surveying the landscape in 1998, a Senate investigative committee concluded that the campaign finance system had suffered a "'meltdown.'" *See McConnell*, 540 U.S. at 129 (quoting S. Rep. No. 105-167, vol. 4, at 4611 (1998)). Four years later, enacting reforms proposed by that committee, Congress passed BCRA. *See id.* at 132. Among other changes,

the new law barred federal candidates and national parties from soft-money fundraising, restricted activities to which state and local parties could devote nonfederal funds, and replaced the "magic words" standard for issue ads with a more robust concept termed "electioneering communication." At the same time, compensating to some degree for these new restrictions, the statute raised hard money contribution limits. Various plaintiffs challenged BCRA's constitutionality, but the Supreme Court largely rejected their claims in *McConnell*. *See* 540 U.S. at 224.

Now we confront a lawsuit cutting the opposite way—arguments not that BCRA is too tough, but that FEC implementing regulations are too lax. Plaintiffs, appellees herein, are Christopher Shays and Martin Meehan, Members of Congress from Connecticut and Massachusetts, respectively, who were BCRA's principal sponsors in the House of Representatives. (The Senate sponsors John McCain and Russell Feingold, joining the suit as amici, support this challenge.) Claiming standing not based on their sponsorship of the legislation, but rather as candidates waging reelection contests governed by BCRA, Shays and Meehan challenged numerous FEC interpretive rules in the U.S. District Court for the District of Columbia. They argued that by construing BCRA's prohibitions too narrowly, these rules effectively permit conduct that BCRA bans, an effect that arises because the statute gives a defense against "any sanction" to "any person" relying in good faith on FEC regulations. 2 U.S.C. § 438(e). In an exceptionally thorough opinion ruling on cross-motions for summary judgment, the district court invalidated and remanded some fifteen rules, while upholding a few more. *See Shays v. FEC*, 337 F. Supp. 2d 28, 130-31 (D.D.C. 2004). Despite a request from the FEC, the court declined to stay its remand pending appeal. *See Shays v. FEC*, 340 F. Supp. 2d 39, 54 (D.D.C. 2004).

The FEC now appeals the district court's summary judgment decision with respect to five rules: (1) standards for "coordinated communication"; (2) definitions of the terms "solicit" and "direct"; (3) the interpretation of "electioneering communication"; (4) allocation rules for state party employee salaries; and (5) a de minimis exemption from allocation rules governing certain contributions, known as "Levin funds," to state and local parties. Following a preliminary discussion of our jurisdiction, we address each rule in turn.

## II.

As a threshold matter, the FEC challenges our jurisdiction, asserting both that Shays and Meehan lack standing and that their claims are unripe. With respect to standing, the district court held that because "the regulations shape the environment in which Plaintiffs must operate" as officeholders and candidates, Shays and Meehan could bring suit challenging those rules. *See* 337 F. Supp. 2d at 44. As to ripeness, the court explained that despite the pre-enforcement timing of Shays's and Meehan's suit, the purely legal nature of the issues removed any constitutional or prudential impediment to immediate consideration of their claims. *See id.* at 47-50. Reviewing de novo, *see, e.g., Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004), *cert. denied*, __ S.Ct. __ (2005); *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964 (D.C. Cir. 1995), we agree with both conclusions.

### *Standing*

Derived from the Constitution's "case-or-controversy" requirement for federal court jurisdiction, Article III standing requires plaintiffs to establish, as an "irreducible constitutional minimum," that they face "injury in fact" caused by the challenged conduct and redressable through relief sought from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  The first element, "injury in fact," requires "an invasion of a concrete and particularized legally protected interest."  *See McConnell*, 540 U.S. at 227.  Harm must be "actual or imminent," not "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  The second element, causation, demands "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotation marks, alterations, and ellipses omitted). Finally, redressability requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted).  In addition to these constitutional requirements, parties claiming standing under the APA must show that their claims fall "arguably within the zone of interests to be protected or regulated by the statute in question." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (internal quotation marks omitted); *see also Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004).

We begin with the last—and easiest—of these requirements.  Never "especially demanding," *Amgen*, 357 F.3d at 108 (internal quotation marks omitted), the zone of interests standard easily encompasses Shays's and Meehan's claims, considering that, as officeholders and candidates for office, they are among those who benefit from BCRA's restrictions on practices Congress believed to be corrupting.  Of course, they are also "among the targets of regulation," as the FEC points out, *see* Reply Br. at 3, but that poses no obstacle.  Indeed, the statute's regulation of candidates is part of the reason *why* candidates like Shays and Meehan possess APA standing, for who suffers more directly when political rivals get elected using illegal financing? *Cf. PDK Labs., Inc. v. DEA*, 362 F.3d 786,

791 (D.C. Cir. 2004) (deeming the zone of interests test satisfied where agency orders, by regulating petitioner's supplier, "necessarily regulate[d]" petitioner). Indeed, the FEC can hardly maintain otherwise, for in arguing that this facial challenge is unripe, the Commission urges Shays and Meehan to await specific abuses and then challenge them through FECA's and BCRA's "unusual" judicial review provision, which permits aggrieved parties "to challenge the FEC's decision *not* to enforce," *see Chamber of Commerce of the U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995) (discussing 2 U.S.C. § 437g(a)(8))—an option that would make no sense if enforcement of these statutes couldn't protect the two Congressmen's interests. Accordingly, like the district court, we consider it "self-evident that Plaintiffs meet the 'zone of interests' test." 337 F. Supp. 2d at 47.

Turning to the constitutional analysis, Shays and Meehan argue that because BCRA thus protects them from prohibited campaign practices, the challenged rules, which they argue permit those very practices, cause them injury redressable through judicial review. Recall that FECA precludes "any sanction" as to "any person" who relies in good faith on FEC rules, "[n]otwithstanding any other provision of law." 2 U.S.C. § 438(e); *see also supra* at 7. Given this defense, Shays's and Meehan's opponents may undertake any conduct permitted by the challenged regulations without fear of penalty, even if that conduct violates campaign statutes. Thus, as Shays and Meehan see it, the FEC rules infringe their BCRA-protected interest in BCRA-compliant elections—an injury the Congressmen believe supports standing. Disagreeing, and relying chiefly on the Supreme Court's denial of standing as to two sets of constitutional claimants in *McConnell*, the FEC disputes Shays's and Meehan's theory with respect to both injury in fact and causation. Specifically, the Commission argues that because Shays and Meehan challenge what the rules permit rather than what they constrain and because Shays's and Meehan's

affidavits demonstrate no specific use of the rules by their political opponents, the two Congressmen cannot show injury. In addition, the Commission asserts that because the rules grant Shays and Meehan the same legal options as their opponents, any disadvantage they suffer stems not from those rules, but from their own choice not to exploit them. We address these arguments in turn, starting with injury in fact and proceeding from there to causation.

Since parties invoking jurisdiction at summary judgment may not rest on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" demonstrating standing, *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)), Shays and Meehan submitted affidavits in the district court supporting their standing claim. They assert that, as Members of Congress and candidates for reelection, they are not only "subject to regulation under [FECA], BCRA, and the Commission's implementing rules," but also "directly affected" by opportunities those statutes and regulations create for their "potential election opponents" and "contributors to and supporters of [their] opponents." (Shays Decl. ¶ 3; Meehan Decl. ¶ 3.) Thus, they aver that "[i]f any of the campaign finance reforms embodied in BCRA is subverted, eroded, or circumvented by the Commission's implementing regulations, I will be forced once again to raise money, campaign, and attempt to discharge my important public responsibilities in a system that is widely perceived to be, and I believe in many respects will be, significantly corrupted by the influence of special-interest money." (Shays Decl. ¶ 4; Meehan Decl. ¶ 4.) Particularizing this claim of injury, the Congressmen then identify consequences for their own campaigns flowing from FEC subversion of each key category of BCRA restrictions. For example, as to BCRA's "soft-money provisions," Shays and Meehan state, "[i]f [FEC] regulations do not faithfully implement the soft-money ban, I face the strong risk that unregulated soft money contributions will again be used in an

attempt to influence federal elections in which I am a candidate." (Shays Decl. ¶ 5; Meehan Decl. ¶ 5.) As to the "sham issue ad provisions," they assert, "[i]f those regulations do not faithfully implement [BCRA], I will be open to attack, during critical time periods just before the primary and general elections, in broadcast advertising campaigns mounted by groups seeking to evade the contribution limits, source prohibitions, and disclosure requirements imposed by Congress." (Shays Decl. ¶ 7; Meehan Decl. ¶ 7.)

Through these and other like assertions, Shays and Meehan aver that under FEC regulations permitting what BCRA prohibits, they suffer injury to their interest, protected by that statute, in seeking reelection through contests untainted by BCRA-banned practices. They assert, in other words, that under such illegal rules, they are "open to attack" by BCRA-banned advertising, face the "strong risk" that opponents will use improper soft money spending against them, and generally must "raise money, campaign, and attempt to discharge [their] important public responsibilities" in an environment rife with practices Congress has proscribed.

In analogous cases, courts have routinely recognized this type of injury—i.e., illegal structuring of a competitive environment—as sufficient to support Article III standing. In the administrative context, for example, we have held that when agencies adopt procedures inconsistent with statutory guarantees, parties who appear regularly before the agency suffer injury to a legally protected interest in "'fair decisionmaking.'" *Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004) ("*EPSA*") (quoting *Prof'l Air Traffic Controllers Org. v. FLRA*, 685 F.2d 547, 563 (D.C. Cir. 1982) ("*PATCO*")) (upholding repeat litigant's standing to challenge allegedly unlawful agency rules on ex parte communication); *see also Lujan*, 504 U.S. at 572-73 & nn.7-8 (indicating that plaintiffs possess standing "to enforce a

procedural requirement the disregard of which could impair a separate concrete interest of theirs" and giving as an example "the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them"); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (holding that litigants may establish injury in fact by "show[ing] that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff"). By the same logic, Shays and Meehan, as regular candidates for reelection, suffer injury to a statutorily protected interest if under FEC rules they must compete for office in contests tainted by BCRA-banned practices. True, the forum here is an election, not agency rulemaking or adjudication, but much as administrative procedures determine how interested regulated parties may go about persuading agencies, so do the challenged FEC campaign finance rules structure candidates' regulated opportunities to persuade the electorate. Thus, given that regulated litigants suffer legal injury when agencies set the rules of the game in violation of statutory directives, the same is true here insofar as the FEC has exposed these regulated candidates to BCRA-proscribed campaign practices.

Likewise indicating that illegal structuring of a competitive environment injures those who are regulated in that environment, longstanding precedent establishes that when a statute "reflect[s] a legislative purpose to protect a competitive interest, [an] injured competitor has standing to require compliance with that provision." *Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 6 (1968). Accordingly, when an agency authorizes certain brokerage services by regulated banks, rival securities dealers may challenge that decision based on their interest in limiting market competition. *See Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 390-94, 403 (1987) (upholding standing based on zone of interests test without specifically addressing Article III requirements); *see also Nat'l Credit Union Admin.*, 522 U.S. at

488 (stating that "competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions"); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970) (indicating "[t]here can be no doubt" as to injury in fact where an agency authorized competition in a market served by petitioner). And when the government grants an application to produce controlled substances, a current manufacturer of the same drugs may challenge that action because "'increased competition represents a cognizable Article III injury.'" *Md. Pharm., Inc. v. DEA*, 133 F.3d 8, 11 (D.C. Cir. 1998) (quoting *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 701 (D.C. Cir. 1994)).

To be sure, in this case, the challenged rules create neither more nor different rival candidates—the electoral analogue to participants in a market. Nor, as the FEC points out, do Shays's and Meehan's rivals enjoy "special benefits" unavailable to the two Congressmen, Reply Br. at 5. Yet Shays and Meehan do face *intensified* competition. That is, under FEC rules permitting what BCRA prohibits, the two Congressmen must anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow. For example, under one challenged regulation (described in detail below), rival candidates may have supporters finance issue ads more than 120 days before the election; according to Shays and Meehan, BCRA restricts such spending. *See infra* at 34-36 (discussing 11 C.F.R. § 109.21). Likewise, rival state parties may spend soft money to pay employees devoting a quarter of their time to defeating Shays and Meehan; the Congressmen believe BCRA requires hard money for such salaries. *See infra* at 57-58 (discussing 11 C.F.R. §§ 106.7(c)(1), (d)(1), 300.33(c)(2)).

Given that accounting for additional *rivals* constitutes injury in fact, *see, e.g.*, *Md. Pharm.*, 133 F.3d at 11, Shays's and Meehan's need to account for additional *practices*—and thus, as

the dissent concedes, additional campaign activity, *see* sep. op. at 14 (Henderson, J., dissenting)—likewise supports Article III standing. As with promulgation of illegal administrative procedures, both these changes—additional competitors and additional tactics—fundamentally alter the environment in which rival parties defend their concrete interests (e.g., their interest in persuading regulators, retaining customers, or winning reelection). Considering that competitors may challenge one such form of change—authorization of rivals—it would be odd if they couldn't challenge more elementary distortions that alter the competitive environment's overall rules. *Cf. Bennett v. Spear*, 520 U.S. 154, 157, 167-68 (1997) (holding that parties who "have competing economic and other interests" in a certain water supply could challenge agency action reducing that supply in the aggregate). To draw an example from the case law, if drug producers may challenge permits for other manufacturers, *see Md. Pharm.*, 133 F.3d at 11-12; *cf. Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497-99 (D.C. Cir. 1996) (upholding drug manufacturer's standing to challenge regulations governing approval of competing generic drugs), couldn't they also challenge rules, say, allowing all producers to forgo mandated warnings, or to advertise in ways Congress has forbidden? And if securities dealers may challenge rules allowing banks to broker stocks, *see Clarke*, 479 U.S. at 403; *cf. Inv. Co. Inst. v. Camp*, 401 U.S. 617, 618-19, 621 (1971) (upholding investment companies' standing to challenge regulations authorizing banks to operate mutual funds), couldn't they likewise dispute regulations allowing all brokerages—bank-based or not—to stay open until ten o'clock though a statute mandates closure by five? No less than when agencies unleash illegal competitors or implement illegal procedures, such across-the-board changes undermine statutorily protected expectations, requiring competitors to account for adverse activity prohibited by law. Because Shays and Meehan have asserted equivalent injury—competition intensified by

BCRA-banned practices—and thus face an equivalent need to adjust their campaign strategy, they too suffer harm to their legally protected interests.

Indeed, our own case law, though avoiding resolving the issue definitively, supports applying competitor standing to politics as well as business. In *Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998), although rejecting a PAC's standing to challenge use of public matching funds by a candidate it opposed, we explained, "AmeriPAC cannot claim standing as a 'competitor' . . . because it was never in a position to receive matching funds itself. *Only another candidate* could make such a claim." *Id.* at 621 (emphasis added); *see also Common Cause v. FEC*, 108 F.3d 413, 419 n.1 (D.C. Cir. 1997) (per curiam) (observing that a candidate-plaintiff who had not appealed "may be a political competitor" of political parties). Moreover, we stated in *Chamber of Commerce v. FEC*, albeit in dicta, that if the FEC declined to enforce certain rules affecting the plaintiff, "a *political competitor* could challenge the Commission's dismissal of its complaint" under FECA's judicial review provision, 2 U.S.C. § 437g(a)(8). *See* 69 F.3d at 603 (emphasis added). Given that Shays and Meehan—unlike the *Gottlieb* plaintiffs—clearly do face genuine rivalry from candidates and parties "in a position," *Gottlieb*, 143 F.3d at 621, to exploit FEC-created loopholes, our cases thus support analogizing their situation to business rivalry, a context where, as explained above, ample precedent supports standing, *see, e.g.*, *Clarke*, 479 U.S. at 403; *Inv. Co. Inst.*, 401 U.S. at 621; *Md. Pharm.*, 133 F.3d at 11-12; *Bristol-Myers Squibb*, 91 F.3d at 1497-99.

Thus, at least two lines of precedent (procedural rights and competitor standing cases) embody a principle that supports Shays's and Meehan's standing: that when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests (e.g., retention of elected office) in that

environment suffer legal harm under Article III. As the district court recognized, opponents' campaign finance options necessarily "affect[] the way these politicians . . . will run their campaigns," such that Shays and Meehan "are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred." 337 F. Supp. 2d at 42-43; *see also Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 36-37 (1st Cir. 1993) (holding that where state law required candidates to choose between public and private financing, that choice's "impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a kind sufficient to confer standing"). Based on our case law and the Supreme Court's, this harm is sufficient for Article III standing.

Resisting this conclusion, the FEC makes two arguments, both embraced by the dissent and both flawed. First, the Commission points out that campaign finance restrictions benefit the general public as well as candidates. Yet the same is true of other statutes that structure rivals' playing fields—statutes routinely held to support such rivals' standing. Consider: although Congress may well have "designed," *Lujan*, 504 U.S. at 573 n.8, environmental assessment requirements to advance a general public interest in environmental protection, *Lujan* makes clear that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement" when following that procedure could prevent concrete injury (e.g., the flooding of plaintiff's home), *see id.* at 572 & n.7. Likewise, although statutory restrictions on brokerage services and drug manufacturing serve (one hopes) to protect the public rather than simply to create monopolistic fiefs, businesses benefitting from such barriers to entry possess standing to enforce them. *See Clarke*, 479 U.S. at 403; *Md. Pharm.*, 133 F.3d at 11-12. By the same token, because BCRA-banned practices may harm Shays's and

Meehan's electoral prospects, and given that Shays and Meehan actively seek reelection in contests governed by the challenged rules—a far cry from living "at the other end of the country from [a challenged] dam," sep. op. at 9 (Henderson, J., dissenting) (quoting *Lujan*, 504 U.S. at 573 n.7)—the two Congressmen may demand adherence to BCRA's requirements, notwithstanding that statute's intended public benefits such as preventing corruption and supporting informed voting. *Cf. Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").

The FEC's second argument is that *McConnell* forecloses Shays's and Meehan's standing. It is true that in *McConnell* the Supreme Court dismissed plaintiffs asserting a supposed "competitive injury"—specifically, "fundraising disadvantage" due to BCRA's elevated hard money caps. 540 U.S. at 228. In citing this dismissal, however, the FEC removes *McConnell*'s holding entirely from its context.

In *McConnell*, the so-called "Adams plaintiffs"—a group of voters, voter organizations, and candidates asserting constitutional challenges to BCRA's elevation of hard money limits—presented two standing theories. First, they argued that "the increases in hard money limits enacted by [BCRA] deprive them of an equal ability to participate in the election process based on their economic status." *Id.* at 227. Disagreeing, the Court explained that because "'[p]olitical "free trade" does not necessarily require that all who participate in the political marketplace do so with exactly equal resources,'" the asserted injury implicated no "legally cognizable right" and thus failed to show invasion of any legally protected interest, as required for standing. *Id.* (quoting *Mass. Citizens for Life, Inc.*, 479 U.S. at 257). Second, the Adams plaintiffs asserted that because the federal candidates in their group would refuse on principle to

accept large contributions, those candidates suffered "'fundraising disadvantage,' making it more difficult for them to compete in elections." *Id.* at 228 (quoting complaint). Rejecting this theory, too, the Court explained: "Their alleged inability to compete stems not from the operation of [the elevated caps], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice. Accordingly, the Adams plaintiffs fail here to allege an injury in fact that is 'fairly traceable' to BCRA." *Id.*

As the district court recognized, *McConnell*'s analysis is distinguishable from this case because here, unlike in *McConnell* where plaintiffs had no right to equal funding, a statute—namely, BCRA—specifically protects the interest in fair reelection contests that Shays and Meehan assert. As the Supreme Court has long recognized, "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *see also Lujan*, 504 U.S. at 578 (reaffirming this principle). Here, by banning certain campaign practices, Congress has created such rights. And because Shays and Meehan fall within the "zone of interests" protected by BCRA, *see supra* at 9-10, the Congressmen hold a "legally cognizable right," *McConnell*, 540 U.S. at 227, to enforce the statute's prohibitions under the APA. *See Clarke*, 479 U.S. at 399 (1987) ("The 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff should be heard to complain of a particular agency decision."); *Mudd v. White*, 309 F.3d 819, 824 (D.C. Cir. 2002) (describing the "zone of interests" test as assessing whether the plaintiff's "asserted interest is among the group of claims that is envisioned by the relevant statute").

Obviously distinguishing the Supreme Court's first holding on the Adams plaintiffs (lack of legally protected interest), this difference also places Shays's and Meehan's suit outside

*McConnell*'s competitive injury analysis. True, much as the Adams plaintiffs could "choose" to accept hard money up to BCRA's maximum, Shays and Meehan could perhaps reduce or even neutralize their opponents' advantages by exploiting illegal FEC safe harbors themselves. To repeat examples given above, they too could have supporters finance issue ads or commit state party employees 25% to federal races. But because being put to the choice of either violating BCRA or suffering disadvantage in their campaigns is itself a predicament the statute spares them, having to make that choice constitutes Article III injury. *Cf. Vote Choice*, 4 F.3d at 36-37 (upholding standing in a candidate's constitutional challenge to state campaign finance laws requiring her to choose "either to shun or to embrace public financing"). Indeed, in a constitutional system based on the rule of law, it would be ironic, to say the least, if Article III barred the courthouse doors to citizens like Shays and Meehan who, because of unlawful government action, may protect their interest in election to Congress only by violating that lawmaking body's own dictates. Given that BCRA's prohibitions would apply absent the challenged safe harbors, Shays's and Meehan's asserted injury—having to defend their office in illegally constituted reelection fights—is not a matter of "their personal choice," as it was in *McConnell*, 540 U.S. at 228. Rather, it stems from the "operation," *id.*, of regulations permitting what BCRA bans. Thus, the dissent wrongly views the claimed predicaments in *McConnell* and in this case as identical: there no right existed; here one does. *See* sep. op. at 12-13 (Henderson, J., dissenting).

*McConnell* itself emphasizes the connection between its two Adams holdings (lack of legal harm and lack of competitive injury). As the Court put it, the Adams plaintiffs' twin standing theories shared "the same premise"—that BCRA's "increased hard-money limits allow plaintiffs-candidates' opponents to raise more money, and, consequently, the plaintiffs-candidates' ability to compete or participate in the electoral process is

diminished." *Id.* Having already rejected the premise (cognizable funding inequity), the Court naturally rejected the deduction (wrongful disadvantage) posed by plaintiffs' second theory. Instead, the court attributed the asserted injury to plaintiffs' own choice—for if funding inequity wasn't cognizable, what besides choice could explain the candidates' disadvantage? Here, in contrast, due to BCRA and the APA, Shays's and Meehan's asserted interest in getting elected through legally financed campaigns is fully cognizable. Accordingly, their claimed injury, having to seek reelection in illegally structured contests (and thus needing either to violate BCRA or to suffer disadvantage), may support Article III standing.

Furthermore, and clinching the point, *McConnell* gives no indication of modifying, much less overruling, cases supporting Shays's and Meehan's standing—cases like *Lujan*, *Clarke*, and *Hardin* (not to mention this court's decisions in *EPSA*, *Maryland Pharmaceutical*, and *Gottlieb*, among others). Nor did the Court suggest that campaign finance laws require unique standing rules; quite the opposite, *McConnell* applies an entirely conventional standing analysis. *See id.* at 225-26 (applying Article III standing test after observing that "[o]n many occasions, we have reiterated the three requirements that constitute the irreducible constitutional minimum of standing" (internal quotation marks omitted)). Given the analogous precedent supporting standing, and considering that *McConnell* is distinguishable in any event, Shays and Meehan have presented a valid theory of injury in fact.

This same precedent—cases involving illegally structured environments—further assures us that notwithstanding Shays's and Meehan's failure to show specific adverse use of challenged safe harbors, the Congressmen's asserted injury is sufficiently "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical," *e.g.*, *Laidlaw*, 528 U.S. at 180.

Although the FEC insists that the Congressmen must demonstrate that specific rivals have exploited each challenged rule, our cases hold that when adverse use of illegally granted opportunities appears inevitable, affected parties may challenge the government's authorization of those opportunities without waiting for specific competitors to seize them. *See, e.g.*, *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (noting that "we have not required litigants to wait until increased competition actually occurs"); *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990) ("[P]etitioners sufficiently establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate potential to compete with petitioners' own sales.").

Given what *McConnell* calls the "hard lesson of circumvention" evident in "the entire history of campaign finance regulation," 540 U.S. at 165, it is indisputable here that regulated parties will seize opportunities created by the challenged rules and thus taint contests through which Shays and Meehan seek reelection. To give two simple examples, one of the challenged regulations permits state and local parties to finance certain salaries with soft money; another allows such parties to use unregulated funds for generic party advertising costing less than $5,000. It seems obvious that party organizations fighting Shays's and Meehan's reelection will employ these options, rather than complying unnecessarily with hard money strictures. *Cf. United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (observing that "courts routinely credit" assertions founded on "basic economic logic" in upholding standing). Accordingly, FEC safe harbors will "almost surely cause" Shays and Meehan harm, *Bristol-Myers Squibb*, 91 F.3d at 1497 (quoting *El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995), and the Congressmen must therefore account for use of those safe harbors in their own campaign strategy, *cf. Vote Choice*, 4 F.3d at 37 (noting that

because "the coerced choice between public and private financing colored [a candidate's] campaign strategy from the outset," the "impact" of that choice "on the strategy and conduct of [the candidate's] political campaign" supported standing (internal quotation marks omitted)).  Hence, "there is no need to wait for injury from specific transactions to claim standing." *Bristol-Myers Squibb*, 91 F.3d at 1497 (quoting *El Paso Natural Gas*, 50 F.3d at 27).

Cases in the administrative context point to the same conclusion.  Although we have described administrative litigants' interest in "'fair decisionmaking,'" *EPSA*, 391 F.3d at 1262 (quoting *PATCO*, 685 F.2d at 563)—analogous to Shays's and Meehan's interest in "fair" reelection fights—as "substantive," *see Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 n.3 (D.C. Cir. 2005), Shays's and Meehan's right to BCRA-compliant electoral contests is also "procedural" insofar as campaign finance rules establish procedures through which candidates seek reelection.  When parties claim standing based on violations of a procedural right, they "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999) (indicating that in procedural rights cases the "necessary showing" supporting the "constitutional minima of injury-in-fact, causation, and redressability . . . is reduced").  Specifically, "so long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of his standing," *Lujan*, 504 U.S. at 573 n.8, the party invoking jurisdiction may establish injury in fact by "show[ing] that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of [that party]," *Fla. Audubon*, 94 F.3d at 664.  Thus, to repeat *Lujan*'s example mentioned earlier, parties living alongside a proposed dam may challenge errors in the construction licensing procedure, "even though [they] cannot

establish with any certainty that [adherence to the procedure] will cause the license to be withheld or altered." *Lujan*, 504 U.S. at 572 n.7. And as we held in *EPSA*, a repeat litigant may challenge rules on ex parte communications between the Federal Energy Regulatory Commission and certain outside parties, even before FERC ever applies them. *See* 391 F.3d at 1262. Insofar as the litigant "is seeking to enforce procedural requirements designed to protect [its] concrete interest in the outcome of hearings to which [it] is a party," its standing, we explained, "is not defeated by the fact that it cannot show, with any certainty, that its or its members' financial interests will be damaged by the operation of the . . . exemption." *Id.*

By the same token, Shays and Meehan may challenge FEC subversion of BCRA's guarantees without "establish[ing] with any certainty," *Lujan*, 504 U.S. at 572 n.7, that the challenged rules will disadvantage their reelection campaigns. Indeed, given the multiplicity of factors bearing on elections and the extreme political sensitivity of judgments about what caused particular candidates to win, requiring candidates to establish that but for certain campaign finance rules they could have won an election seems no more reasonable than requiring plaintiffs to "demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different"—precisely the showing that administrative cases do *not* require. *See Ctr. for Law & Educ.*, 396 F.3d at 1160 (citing *Lujan*, 504 U.S. at 572 n.7). Because BCRA establishes campaign procedures "designed to protect [the Congressmen's] threatened concrete interest," *Lujan*, 504 U.S. at 573 n.8, in winning reelection, Shays and Meehan possess standing to insist on those procedures based on the "distinct risk," *Fla. Audubon*, 94 F.3d at 664, documented in their affidavits, that political rivals will exploit the challenged rules to their disadvantage. *See Ctr. for Law & Educ.*, 396 F.3d at 1161 n.3 (indicating that "a federal agency's arguably *ultra vires* publications of regulations purporting to authorize ex parte communications in

violation of the Sunshine Act" violates "substantive rights created under the Act," thus conferring standing on affected litigants challenging those rules (discussing *EPSA*, 391 F.3d at 1261-62)).

Again, the FEC, like the dissent, cites *McConnell* as contrary authority, but again the analogy falls short. Dismissing different parties from those mentioned earlier ("McConnell plaintiffs" as opposed to "Adams plaintiffs"), the *McConnell* Court found no standing as to plaintiffs challenging time-limited broadcast restrictions based on one senator's stated desire to violate them during his next reelection campaign—then over four years away. *See McConnell*, 540 U.S. at 224-25. "Because Senator McConnell's current term does not expire until 2009," the Court observed, "the earliest day he could be affected by [the challenged provision] is 45 days before the Republican primary election in 2008. This alleged injury in fact is too remote temporally to satisfy Article III standing." *Id.* at 226. Contrary to the dissent's suggestion that *McConnell* broadly requires identification of "some specific injury arising from the regulations," sep. op. at 14 (Henderson, J., dissenting), the Court thus relied entirely on lack of immediacy in finding the McConnell plaintiffs' injury insufficient for standing. In other words, far from foreclosing standing for regulated parties like Shays and Meehan, the *McConnell* Court concluded that because any relevant application of the challenged rules would occur far in the future, the McConnell plaintiffs were not in fact "subject to regulation" at all, *id.* at 15. As House members, Shays and Meehan face reelection every two years—and indeed underwent reelection during the pendency of this appeal. Accordingly, no comparable imminence problem exists here. Following analogous cases such as *Lujan*, *EPSA*, and *Louisiana Energy*—precedent untouched by *McConnell*—we therefore conclude that Shays and Meehan suffer injury in fact insofar as FEC rules permit BCRA-banned practices, thereby depriving the

Congressmen of their right to reelection contests conducted in accordance with that statute.

As to causation, the two Congressmen argue that their asserted injury—deprivation of fair reelection contests guaranteed by BCRA—is fairly traceable to the FEC's rules because absent those rules BCRA's prohibitions would prevent their opponents from tainting their electoral fights (or at least impose a "sanction" for doing so, 2 U.S.C. § 438(e); *see also supra* at 7, 10). The FEC sees the issue quite differently. Since the challenged rules merely permit conduct by others rather than "restrict[]" conduct Shays and Meehan would themselves undertake, the Commission insists its rules have caused the Congressmen no harm. Appellant's Br. at 13.

Abundant precedent contradicts the FEC's view. In fact, "the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc) (upholding standing in a facial challenge to regulations allegedly authorizing statutorily proscribed inhumane treatment of animals) (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976)). Thus, for example, in *Japan Whaling Association v. American Cretacean Society*, 478 U.S. 221 (1986), scientists and whale-watchers possessed standing even though the agency action they challenged—failure to certify Japan as a bad apple under international whaling conventions—limited restraints on whale-hunting rather than imposing them on whale-watching. *See id.* at 230 n.4. Likewise, to repeat examples given above, FERC litigants may challenge administrative procedures that could benefit rivals, *see EPSA*, 391 F.3d at 1261-62, and economic competitors may challenge decisions allowing additional entrants into their markets, *see, e.g., Nat'l Credit Union Admin.*,

522 U.S. at 488. If it makes no difference in such cases that actual injury depends on action by non-governmental third-parties—those spearing whales, competing economically, or trading secret missives with FERC—neither should it matter here that the challenged rules unchain Shays's and Meehan's opponents, rather than chaining the two Congressmen.

Attempting to show otherwise, the FEC once again cites *McConnell*'s dismissal of the Adams plaintiffs. It insists that based on the Supreme Court's holding, the only cause of Shays's and Meehan's asserted injury is the Congressmen's own "choice" not to fight fire with fire by exploiting FEC safe harbors themselves. This causation theory fails for the same reason the FEC's injury argument fails. Whereas in *McConnell* the asserted injury stemmed from no law's "operation," 540 U.S. at 228, Shays's and Meehan's injury—deprivation of BCRA-compliant reelection contests—exists only insofar as FEC safe harbors permit what BCRA forbids. Consequently, regardless of how Shays and Meehan "choose" to negotiate the illegally structured environment in which the FEC has placed them, Shays's and Meehan's injury is "fairly traceable," *e.g.*, *Laidlaw*, 528 U.S. at 180, to the FEC's alleged violation of congressional commands.

Again, substantial precedent reassures us of this conclusion—precedent *McConnell* never mentions, much less questions. At bottom, though dealing with the same subject-matter as that case, Shays's and Meehan's suit is an entirely conventional administrative law claim, i.e., a facial challenge to allegedly invalid regulations affecting the Congressmen's interests. Viewed in such terms, Shays's and Meehan's causation theory is unremarkable. As noted earlier, we held in *ALDF*, based in part on Supreme Court precedent, that "a plaintiff satisfies the causation prong of constitutional standing by establishing that the challenged agency rule permitted the activity that allegedly injured her, when that activity would

allegedly have been illegal otherwise." 154 F.3d at 440-41. *Japan Whaling* rests on the same view. Although there the injury-defining law was a whale-harvesting treaty rather than a campaign finance statute, the causal theory was identical: by tolerating what the law condemned, the government caused plaintiffs' injury. *See Japan Whaling*, 478 U.S. at 230 n.4. Likewise, in competition cases, the Supreme Court has upheld challenges to rules allowing competition allegedly prohibited by statute—again, a claim that parallels Shays's and Meehan's. *See, e.g.*, *Nat'l Credit Union Admin.*, 522 U.S. at 488; *Data Processing*, 397 U.S. at 151.

Although the FEC insists this case falls outside the conventional rule because Shays and Meehan possess the same legal options as their rivals and thus could potentially benefit from the challenged rules, our case law shows otherwise. Ordinarily, of course, mimicking injurious conduct does nothing to interrupt causation: the whale-watchers in *Japan Whaling* could hardly protect their pastime by joining the hunt. And while here use of challenged rules could perhaps mitigate any harm to Shays's and Meehan's electoral prospects, the same was true in *EPSA*, where the disputed regulations, which allowed ex parte communication with certain third parties called market monitors, could well have helped, rather than hurt, the petitioner. There, far from suggesting that potential benefit foreclosed standing, we held that petitioner satisfied Article III because it "routinely appear[ed] before FERC in contested hearings in which market monitors have an interest," 391 F.3d at 1262—a condition that created opportunity for benefit as well as detriment. Similarly, in *Lujan*'s dam example, affected parties could insist on statutorily required procedures even though adherence to those procedures might well hasten, not prevent, the dam's construction. *See* 504 U.S. at 572-73 & nn.7-8. As in these cases, Shays's and Meehan's injury entails deprivation of a statutory right to "'fair decisionmaking,'" *EPSA*, 391 F.3d at 1262 (quoting *PATCO*, 685 F.2d at 563).

Accordingly, FEC rules structuring reelection contests in violation of that right cause harm regardless of whether those rules ultimately hurt or help the Congressmen's reelection prospects.

To illustrate the counterintuitive character of the FEC's position, we think it worth noting that were the Commission's causation argument correct, Shays and Meehan would never have standing to challenge the rules. Even if an opponent made express use of illegal safe harbors, even if that use demonstrably influenced voters, and indeed even if Shays and Meehan responded by seeking administrative enforcement and then challenging the FEC's dismissal of their complaint—a review procedure the Commission urges the Congressmen to follow in its ripeness argument, *see infra* at 31-32—the Congressmen would nevertheless lack standing. As the FEC sees it, even then, Shays's and Meehan's own scruples, not allegedly illegal FEC rules, would have caused their injury. Although "an inescapable result of any standing doctrine application is that at least some disputes will not receive judicial review," *Fla. Audubon*, 94 F.3d at 665, that result would be surprising here given that Shays and Meehan, as directly regulated parties, are the most natural challengers for these rules, and agency regulations are ordinarily subject to review. *Cf. Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (noting "the strong presumption that Congress intends judicial review of administrative action"); *United States v. Nourse*, 34 U.S. (9 Pet.) 8, 28-29 (1835) (Marshall, C.J.) ("It would excite some surprise if, in a government of laws and of principle, . . . a ministerial officer might, at his discretion, issue this powerful process, . . . leaving to that debtor no remedy, no appeal to the laws of his country . . . .").

Accordingly, finding *McConnell* distinguishable, and following the long line of cases holding that affected parties may challenge regulations allowing what a statute prohibits, *see, e.g.*,

*Nat'l Credit Union Admin.*, 522 U.S. at 488; *Data Processing*, 397 U.S. at 151; *Japan Whaling*, 478 U.S. at 230 n.4; *ALDF*, 154 F.3d at 440, we conclude that Shays and Meehan have shown causation, as well as injury in fact.

This leaves only redressability. The FEC doesn't dispute this element, nor could it, for "[w]here an agency rule causes the injury, as here, the redressability requirement may be satisfied by vacating the challenged rule." *Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005) (internal quotation marks and ellipsis omitted). Thus, Shays and Meehan have satisfied all three requirements of constitutional standing. "[F]orced," as they put it, to seek reelection in illegally structured contests, the Congressmen seek no mere "advisory opinion"—the evil Article III averts, *see Flast v. Cohen*, 392 U.S. 83, 96-97 & n.14 (1968). Rather, because invalidation of FEC safe harbors permitting what BCRA bans would vindicate Shays's and Meehan's right to BCRA-compliant elections, the two Congressmen possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions," *Baker v. Carr*, 369 U.S. 186, 204 (1962). Having reached this conclusion, we need not consider Shays's and Meehan's fallback argument that the challenged rules' effects on disclosure requirements give them "informational standing."

### *Ripeness*

In addition to challenging standing, the FEC argues that Shays's and Meehan's suit is unripe. A further requirement of justiciability, albeit one "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction,'" ripeness "requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park*

*Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Under our case law, "the primary focus of the ripeness doctrine is to balance the petitioners' interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subject to review and the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *AT&T Corp. v. FCC*, 349 F.3d 692, 699 (D.C. Cir. 2003) (internal quotation marks omitted).

Here, as to fitness, because this case is "purely one of statutory interpretation," *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 479 (2001), the issues are "purely legal" and thus "presumptively suitable to judicial review," *AT&T*, 349 F.3d at 699 (internal quotation marks omitted). In fact, in this case, no "crystalliz[ation]" of the disputed policies will ever occur, for as Shays and Meehan point out, conduct protected by the challenged safe harbors will *never* be subject to enforcement proceedings. (As noted earlier, good-faith reliance on FEC regulations affords a defense against FEC sanction, *see* 2 U.S.C. § 438(e).) For that very reason, moreover, the regulations also cause hardship. By removing certain conduct from any risk of enforcement, the challenged safe harbors establish "legal rights" to engage in that conduct, thus "creat[ing] adverse effects of a strictly legal kind." *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

Making a related point, the FEC also suggests that because FECA permits judicial review to determine whether even *non*-enforcement decisions are "contrary to law," *see* 2 U.S.C. § 437g(a)(8); *supra* at 10, Shays and Meehan cannot show that "no other adequate remedy in a court" exists, as required for APA jurisdiction, 5 U.S.C. § 704; *see generally Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 945. We think this claim even weaker. To begin with, although we have identified

"impermissible interpretation of the Act" as an element of the "contrary to law" test, we did so in a case reviewing an advisory opinion, not an FEC regulation. *See Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). Were a regulation applicable, given that reliance on that regulation would afford a defense to "any sanction," *see* 2 U.S.C. § 438(e), the court might well uphold FEC non-enforcement without ever reaching the regulation's validity. *Cf. Chamber of Commerce*, 69 F.3d at 603 (identifying the risk of enforcement under section 437g(a)(8) as a basis for standing though going on to invalidate the rule that would thus be enforced). Moreover, because of that defense, the particular conduct at issue could never be sanctioned, though penalties might have been possible under valid rules. Given these deficiencies, this alternative remedy hardly appears adequate, and so poses no barrier to Shays's and Meehan's facial challenge here.

### III.

On the merits, we undertake our analysis pursuant to two familiar standards of review: *Chevron* and the Administrative Procedure Act. As both sides agree, because the regulations at issue interpret statutes the FEC administers, we review them under the two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), asking first "whether Congress has spoken 'directly . . . to the precise question at issue,'" and second, if it has not, whether the agency's interpretation is "reasonable." *See AFL-CIO v. FEC*, 333 F.3d 168, 172-73 (D.C. Cir. 2003) (quoting *Chevron*, 467 U.S. at 842-43) (reviewing FEC regulations). At the same time, because the regulations reflect final agency action under the APA, we ask whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Applying these standards here, we affirm the district court's invalidation of all five rules at issue in this appeal. In reviewing each rule, we begin with *Chevron* step one, asking whether the rule runs counter to the "unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843. We conclude that two rules—the "solicit"/"direct" and "electioneering communication" definitions—fail this threshold inquiry. As to the remaining three—the coordinated communication standard, salary allocation provision, and de minimis exemption—we affirm the district court's invalidation on APA grounds without reaching *Chevron* step two. As our cases explain, "our inquiry at the second step of *Chevron*, i.e., whether an ambiguous statute has been interpreted reasonably, overlaps with the arbitrary and capricious standard," *Chamber of Commerce of the U.S. v. FEC*, 76 F.3d 1234, 1235 (D.C. Cir. 1996) (citing *Nat'l Ass'n of Regulatory Utility Comm'rs v. ICC*, 41 F.3d 721, 726-27 (D.C. Cir. 1994)), for "[w]hether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable," *Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000); *see also Gen. Am. Transp. Co. v. ICC*, 872 F.2d 1048, 1053 (D.C. Cir. 1989) ("Both questions require us to determine whether the Commission, in effecting a reconciliation of competing statutory aims, has rationally considered the factors deemed relevant by the Act."). Here, we need not decide whether these three rules represent altogether impermissible interpretations of FECA and BCRA—the *Chevron* step two inquiry, *see Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004) (indicating that at *Chevron* step two we "defer to the agency's interpretation as long as it is 'based on a permissible construction of the statute'" (quoting *Chevron*, 467 U.S. at 843))—because in any event the FEC has given no rational justification for them, as required by the APA's arbitrary and capricious standard, *see Motor Vehicle Mfrs. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (interpreting the APA to require that agencies

"articulate a satisfactory explanation for [their] action including 'a rational connection between the facts found and the choice made'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))).

*Coordinated Communication*

FECA has long restricted coordination of election-related spending between official campaigns and outside groups. The reason for this is obvious. Without a coordination rule, politicians could evade contribution limits and other restrictions by having donors finance campaign activity directly—say, paying for a TV ad or printing and distributing posters. To avoid such subterfuge, FECA defines "contribution" to include any "expenditure[] made . . . in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate," 2 U.S.C. § 441a(a)(7)(B)(i), and then defines "expenditure" as any purchase, payment, loan, or gift "made . . . for the purpose of influencing" a federal election, *id*. § 431(9)(A). Thus, if someone makes a purchase or gift with the purpose of influencing an election and does so in cooperation with a candidate, FECA counts that payment as a campaign contribution. At the same time, and as a further stopgap, FECA's coordination provision designates any "financing . . . of the dissemination, distribution, or republication" of campaign materials as an "expenditure," and thus as a "contribution" when coordinated. *Id.* § 441a(a)(7)(B)(iii).

BCRA made two important changes to these provisions. First, as part of its effort to reign in party fundraising, the statute added a coordination rule for parties comparable to the preexisting rule for candidates. *See id.* § 441a(a)(7)(B)(ii). Second, and more important here, Congress ordered the FEC to rewrite its regulations interpreting these provisions with respect to "coordinated communication." *See* BCRA § 214(c), 116 Stat. 81, 95.

Under pre-BCRA regulations, the FEC determined whether public communications such as radio and television ads were "coordinated" based largely on whether the candidate had engaged in "substantial discussion or negotiation" with an outsider, resulting in "collaboration or agreement." *See Shays*, 337 F. Supp. 2d at 55-56 & n.25 (quoting old regulation). Absent that degree of cooperation, the communication was considered uncoordinated and thus would not count as a FECA contribution. BCRA instructed the Commission to scrap this approach. "The regulations on coordinated communications . . . are repealed," Congress declared. "The Federal Election Commission shall promulgate new regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees. The regulations shall not require agreement or formal collaboration to establish coordination." BCRA § 214(c), 116 Stat. at 95. Apart from this negative command—"shall not require"—BCRA merely listed several topics the rules "shall address," providing no guidance as to how the FEC should address them. *See id.*

Acting pursuant to this open-ended directive, the FEC adopted the regulation at issue here. Under its new test, communications count as "coordinated" (and thus as contributions) if: (1) someone other than the candidate, party, or official campaign pays for them, (2) the communication itself meets specified "content standards," and (3) the payer's interaction with the candidate/party satisfies specified "conduct standards." 11 C.F.R. § 109.21. Under the "content" element—the only component at issue here—communications made within 120 days of a general election or primary and "directed" at the relevant electorate may qualify as "coordinated" if they refer to a political party or "clearly identified candidate for Federal office." *Id.* § 109.21(c)(4). Before the 120-day mark, the rule covers only communications that either recycle official campaign materials or "expressly

advocate[] the election or defeat of a clearly identified candidate for federal office." *See id.* § 109.21(c)(2)-(3).

According to Shays and Meehan, this limitation on the rule's coverage outside the 120-day window offers politicians and their supporters an unreasonably generous safe harbor. Several examples should help illustrate their concerns. Under the new rules, more than 120 days before an election or primary, a candidate may sit down with a well-heeled supporter and say, "Why don't you run some ads about my record on tax cuts?" The two may even sign a formal written agreement providing for such ads. Yet so long as the supporter neither recycles campaign materials nor employs the "magic words" of express advocacy—"vote for," "vote against," "elect," and so forth—the ads won't qualify as contributions subject to FECA. Ads stating "Congressman X voted 85 times to lower your taxes" or "tell candidate Y your family can't pay the government more" are just fine. And even within 120 days of the election (though Shays and Meehan appear not to challenge this aspect of the rule), supporters need only avoid communications that identify candidates or parties by name. Ads regarding, say, economic effects of high taxes or tragic consequences of foreign wars are not contributions—again, even if formally coordinated with the official campaign.

The district court held that nothing in BCRA permits such content-based exclusions. Although the court rejected Shays's and Meehan's *Chevron* one argument, explaining that because BCRA ordered promulgation of new regulations while "provid[ing] no express guidance on the matter of content restrictions," Congress had not spoken directly to the issue, *see* 337 F. Supp. 2d at 61-62, it held that the FEC's regulations "undercut[] FECA's statutory purposes" and thus were "entitled to no [*Chevron* two] deference." *Id.* at 64-65. "A communication that is coordinated with a candidate or political party," the district court wrote, "has value to the political actor.

To exclude certain types of communications regardless of whether or not they are coordinated would create an immense loophole that would facilitate the circumvention of the Act's contribution limits, thereby creating 'the potential for gross abuse.'" *Id.* at 65 (quoting *Orloski*, 795 F.2d at 165).

We reach the same result, though for slightly different reasons. Regarding *Chevron* step one, we agree that Congress has not spoken directly to the issue at hand. To be sure, it seems hard to imagine that Representatives and Senators voting for BCRA would have expected regulations like these. Although Congress abrogated the FEC's old "collaboration or agreement" standard, the new rule permits significant categories of expression—e.g., non-express advocacy more than 120 days before an election—even where formal collaboration or agreement occurs. And while BCRA's "electioneering communication" provisions (mentioned earlier and discussed below, *see infra* at 41, 52-53) disavow the "express advocacy" test—a standard *McConnell* describes as "functionally meaningless," 540 U.S. at 193—the FEC has resurrected that standard here, allowing unrestricted collaboration outside the 120 days so long as the communication's paymasters avoid magic words and redistribution. That said, in the BCRA provision most clearly on point—the directive calling for new regulations—Congress studiously avoided prescribing any specific standard, save abrogation of the "collaboration or agreement" test. Given this "lack of guidance in the statute," we cannot say that BCRA clearly forecloses the FEC's approach. *See George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (D.C. Cir. 1998).

Nor do we see clearly contrary intent, as do Shays and Meehan, in FECA's preexisting "expenditure" and "contribution" definitions. True, under the statute, coordinated expenditures "shall be considered to be a contribution," so if a communication involves "expenditure" and is made "in

cooperation, consultation, or concert with, or at the request or suggestion of" a candidate or party—the provision's two elements, *see* 2 U.S.C. §§ 441a(7)(B)(i), (ii)—then the FEC lacks discretion to exclude that communication from its coordinated communication rule. Yet to qualify as "expenditure" in the first place, spending must be undertaken "for the purpose of influencing" a federal election (or else involve "financing" for redistribution of campaign materials). *See* 2 U.S.C. §§ 431(9)(A), 441a(a)(7)(B)(iii). And as the FEC points out, time, place, and content may be critical indicia of communicative purpose. While election-related intent is obvious, for example, in statements urging voters to "elect" or "defeat" a specified candidate or party, the same may not be true of ads identifying a federal politician but focusing on pending legislation—a proposed budget, for example, or government reform initiatives—and appearing three years before the next election. Nor is such purpose necessarily evident in statements referring, say, to a Connecticut senator but running only in San Francisco media markets.

Insofar as such statements may relate to political or legislative goals independent from any electoral race—goals like influencing legislators' votes or increasing public awareness—we cannot conclude that Congress unambiguously intended to count them as "expenditures" (and thus as "contributions" when coordinated). To the contrary, giving appropriate *Chevron* deference, we think the FEC could construe the expenditure definition's purposive language as leaving space for collaboration between politicians and outsiders on legislative and political issues involving only a weak nexus to any electoral campaign. Moreover, we can hardly fault the FEC's effort to develop an "objective, bright-line test [that] does not unduly compromise the Act's purposes," considering that we approved just such a test for "contribution" in *Orloski*. 795 F.2d at 165. Accordingly, we reject Shays's and Meehan's argument that FECA precludes content-based standards under *Chevron* step

one. And for the same reasons, we disagree with the district court's suggestion that any standard looking beyond collaboration to content would necessarily "create an immense loophole," thus exceeding the range of permissible readings under *Chevron* step two, 337 F. Supp. 2d at 65.

In our view, the challenged regulation's fatal defect is not that the FEC drew distinctions based on content, time, and place, but rather that, contrary to the APA, the Commission offered no persuasive justification for the provisions challenged by Shays and Meehan, i.e., the 120-day time-frame and the weak restraints applying outside of it. As noted earlier, *McConnell* describes the express advocacy test, which before BCRA distinguished advocacy subject to FECA from unregulated "issue" ads, as "functionally meaningless." 540 U.S. at 193. "Not only can advertisers easily evade the line by eschewing use of magic words, but they would seldom choose to use such words even if permitted." *Id.* "In the 1998 election cycle, just 4% of candidate advertisements used magic words; in 2000, that number was a mere 5%." *Id.* at 127 n.18. Of course, express advocacy could hardly fail to count as expenditure; statements like "vote for" clearly aim to influence elections. Nor could the FEC permit redistribution of campaign material, since the statute unambiguously designates that activity as "expenditure" for purposes of this provision. *See* 2 U.S.C. § 441a(7)(B)(iii). Yet the Commission took the further step of deeming these two categories adequate by themselves to capture the universe of electorally oriented communication outside the 120-day window. That action requires some cogent explanation, not least because by employing a "functionally meaningless" standard outside that period, the FEC has in effect allowed a coordinated communication free-for-all for much of each election cycle.

We see nothing in the FEC's official explanation that satisfies APA standards. The Commission's source for the 120-

day period was an unrelated BCRA provision requiring hard money financing for state party voter registration drives within 120 days of an election. *See* 68 Fed. Reg. at 430 (describing the 120-day period for coordinated communication as "based on 2 U.S.C. 431(20)(A)(i)," which defines such registration drives as "Federal election activity"); 2 U.S.C. § 441i(b) (restricting financing of "Federal election activity"). Drawing on this provision, the FEC explained that "Congress has, in part, defined 'Federal election activity' in terms of a 120-day time frame, deeming that period of time before an election to be reasonably related to that election." 68 Fed. Reg. at 430. Yet this observation has no bearing on the issue before us absent evidence that registration activity and electoral advocacy occur on similar cycles. For all we know from this record, registration efforts may significantly influence elections only in the immediate run-up to the vote, whereas candidate-centered advertisements may affect voters even when broadcast more than 120 days before the race closes. In fact, in a companion provision to the voter registration rule, BCRA imposes even stricter financing restrictions—without temporal limitation—on "public communication[s] that refer[] to a clearly identified candidate for Federal office . . . and that promote[] or support[] a candidate for that office, or attack[] or oppose[] a candidate for that office." 2 U.S.C. § 431(20)(A)(iii). Although the FEC acknowledged that its 120-day content standard was "more conservative" than this provision, *see* 68 Fed. Reg. at 430, it never explained why the time-frame for voter registration was more relevant than BCRA's rule for "public communications," seemingly a far more comparable subject-matter.

Besides citing the voter registration rule, the FEC listed two "advantages" of the 120-day time-frame: "First, it provides a 'bright-line' rule. Second, it focuses the regulation on activity reasonably close to an election, but not so distant from the election as to implicate political discussion at other times." 68 Fed. Reg. at 430. The first of these bromides provides no

independent basis for the rule: a bright line can be drawn in the wrong place. The second does not so much answer the question as ask it. *Why* is 120 days "reasonably close" but not "so distant"? Without further explanation, we have no assurance that 120 days reasonably defines the period before an election when non-express advocacy likely relates to purposes other than "influencing" a federal election—the line drawn by the statute's "expenditure" definition, 2 U.S.C. § 431(9)(A).

Taking a new tack in its briefs, the FEC now argues that BCRA itself indicates that 120 days is reasonable because a statutory provision on "electioneering communications"—ads that automatically count as "contributions" when coordinated with a candidate—includes a 30/60-day time-frame. *See id.* §§ 434(f)(3), 441a(a)(7)(C). The "electioneering communication" concept, discussed at greater length below, covers radio and television advertisements that (1) clearly identify a candidate or party, (2) target the relevant electorate, and (3) appear within 60 days of a general election or 30 days of a primary. *See id.* § 434(f)(3)(A); *infra* at 52-53. Obviously similar to the content standard for the 120-day period, the "electioneering communication" definition differs principally in that it is limited to radio and television, whereas the content standard applies to other media as well. *See* 68 Fed. Reg. at 429-30. Although in its explanation the FEC sought to distinguish the shorter time-frame for these communications rather than rely on it as justification for the 120-day rule, *see* 68 Fed. Reg. at 430, the Commission now insists that if 30-60 days is reasonable for these ads, then "the Commission's drawing of a temporal line two to four times as far from the election for similar communications that are coordinated is surely permissible." Appellant's Br. at 32-33. Even assuming this "post hoc rationalization[] for agency action" is properly before us, *see Secs. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 468 U.S. 137, 143-44 (1984), we reject it.

For one thing, the proposition that 120 is twice 60 and four times 30, though arithmetically indisputable, is no reason to select that number over any other. Why not triple 60, or multiply 30 by one-and-a-half? Alternatively, if 30 to 60 days is too short, as the FEC indicated in its explanation, *see* 68 Fed. Reg. at 430, why not go all the way and apply the standard at all times, as in the "public communication" provision discussed earlier? In any event, while "electioneering" ads are clearly one category of communications that may count as coordinated expenditures under BCRA, nothing in the statute suggests they represent the only—or even primary—such category. Acknowledging as much, the FEC's own rule rejects the electioneering definition's time limit (expanding it to 120 from 30/60), as well as its media limitations (including print advertising and other media besides radio and TV). By the same token, nothing should prevent the FEC from regulating other categories of non-electioneering speech—non-express advocacy, for example—outside the 120 days.

Finally, the FEC points out that limiting its standard to express advocacy and campaign redistribution outside the 120 days preserves space for political activities unrelated to elections. True enough, but so would regulating nothing at all, and that would hardly comport with the statute. Notwithstanding its obligation to "attempt to avoid unnecessarily infringing on First Amendment interests," *AFL-CIO*, 333 F.3d at 179, the Commission must establish, consistent with APA standards, that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)). The record before us, however, provides no assurance that the FEC's standard does not permit substantial coordinated expenditure, thus tossing out

the proverbial baby (spending qualifying as contributions) with the bath water (political advocacy). *Cf. AFL-CIO*, 333 F.3d at 179 (invalidating rule where FEC "fail[ed] to undertake . . . tailoring" consistent with First Amendment interests).

For their part, Shays and Meehan argue not only that the FEC has in fact failed to justify its standard, but also that doing so would be impossible. In support of this claim, they urge us to take judicial notice that substantial election-oriented advertising occurred beyond the 120-day window in recent presidential races, a fact that, if true, would undercut the Commission's view that it has drawn the line in the right place. That factual assertion, however, is better directed to the FEC's expertise, and indeed illustrates the sort of inquiry the Commission should have undertaken. Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside that window? Do congressional, senatorial, and presidential races—all covered by this rule—occur on the same cycle, or should different rules apply to each? And, perhaps most important, to the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions? The FEC must carefully consider these questions, for if it draws the line in the wrong place, its action will permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration.

In sum, while we accept the FEC's premise that time, place, and content may illuminate communicative purpose and thus distinguish FECA "expenditures" from other communications, we detect no support in the record for the specific content-based standard the Commission has promulgated. Accordingly, finding the rule arbitrary and capricious under the APA, we shall affirm the district court's invalidation.

44

### *"Solicit" and "Direct"*

As noted earlier, one of BCRA's main objectives is to shut down the so-called "soft money" system whereby political parties employed funds outside FECA's controls to finance political activities related to federal elections. The "cornerstone" of this effort, *McConnell*, 540 U.S. at 133, a new prohibition on soft-money fundraising by national party organizations, provides as follows:

> A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

2 U.S.C. § 441i(a)(1). The same prohibition extends to the national party committees' officers and agents, as well as subordinate entities. *See id.* § 441i(a)(2). In addition, federal candidates and officeholders may not "solicit, receive, direct, transfer, or spend" soft money, *id.* § 441i(e), nor may national, state, or local party organizations "solicit" or "make or direct" contributions to certain tax-exempt groups, *id.* § 441i(d).

Shays and Meehan challenge FEC regulations interpreting "solicit" and "direct" with respect to these provisions. In effect, the Commission has interpreted both terms to mean "ask." Under its new regulations, "to solicit means to ask that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value," whether that gift is made "directly" or "through a conduit or intermediary." 11 C.F.R. § 300.2(m). "[T]o direct means to ask a person who has expressed an intent to make a contribution, donation, or transfer of funds, or to provide anything of value, to make that contribution, donation, or transfer of funds, or to provide that thing of value,

including through a conduit or intermediary." *Id.* § 300.2(n). Thus, in the FEC's view, fundraisers "solicit" money when they ask for it (as in, "please give to the party") and they "direct" contributions when they ask for them following an expression of interest, such as when a donor says, "I've got money to burn" and the politician responds, "why not give it to X?"

Whether this interpretation is reasonable depends on the meaning of "ask." Shays and Meehan argue that this term, as used in the regulations, requires "an outright, explicit request—'please give'—that is contained in a single communication." Appellee's Br. at 28. The district court shared this view, finding it supported by the FEC's explanatory statement that "[b]y using the term 'ask,' the Commission defined 'solicit' to require some affirmative verbalization or writing, thereby providing members of Congress, candidates and committees with an understandable standard," Contribution Limitations & Prohibitions, 67 Fed. Reg. 69,928, 69,942 (Nov. 19, 2002). *See Shays*, 337 F. Supp. 2d at 78-79. Read this way, as the district court observed, the rule permits national parties, candidates, and officeholders "to funnel nonfederal money into different organizations by simply not 'asking' the donors to do so, but using more nuanced forms of solicitation." *Id.* at 79. Shays and Meehan offer the following examples. Under the regulation, "a Senator who told a group of party donors that 'it's important for our state party to receive at least $100,000 from each of you in this election'—with or without an accompanying wink—would not have 'asked' under the Commission's regulations," and thus would have neither "solicited" nor "directed" funds in violation of BCRA. Appellee's Br. at 30. Likewise, statements like "*X* is an effective state party organization; it needs to get as many $100,000 contributions as possible" would again neither "solicit" nor "direct" because they would not "ask." *Id.* at 31.

In its briefs, the FEC questions this reading of the regulations, even calling it a "straw man." Reply Br. at 11. At oral argument, however, Commission counsel was unable to reassure us that the rules would cover "nuanced" situations like Shays's and Meehan's hypotheticals. Indeed, though pressed to represent the FEC's views, counsel went no further than to call the Congressmen's hypotheticals "gray area[s]," stating that he "simply can't predict how the Commission would vote on them." That response came as no surprise, for the FEC's official explanatory statement abundantly supports the narrow reading that the Congressmen, like the district court, find embodied in the regulations.

During the rulemaking, commenters called the FEC's definition "too narrow." 67 Fed. Reg. at 69,942. They advocated construing "solicit" to mean "request, suggest or recommend," as Commission staff had proposed. *Id.* Yet the Commission rejected this alternative, deeming it inconsistent with "the need for clear definitions to avoid ambiguity, vagueness and confusion as to what activities or conversations would constitute solicitations." *Id.* Explaining the distinction, the Commission observed that it objected to "the impressionistic or subjective aspects of the term 'suggest' and 'request.'" *Id.* "[W]hile the terms 'suggest' or 'request' . . . encompass a wide array of activity, it is not clear that they would cover more direct verbalizations or writings captured by terms such as 'demand,' 'instruct,' or 'tell,' which the Commission believes are captured by the term 'ask.'" *Id.* Further:

> The Commission was unwilling to use the far more expansive term "suggest," for concern that such a vague term could subject persons to investigation and prosecution based on highly subjective judgments about whether a particular remark or action constituted "suggestion." The definition of "solicit" is intended to include a palpable

communication intended to, and reasonably understood to, convey a request for some action.

*Id.* (internal quotation marks omitted).

Although the FEC's explanation thus suggested that statements "reasonably understood" as "asking" could qualify as such, the Commission could not have intended thereby to suggest that its rule covered indirect requests, for that interpretation would overlook the distinction the FEC drew between "ask" and "suggest." According to the FEC, "ask" covers "direct" statements—expressions "captured" by verbs such as "demand" and "tell"—whereas "suggest" does not. Thus, by lopping off "suggest" (as well as "recommend") from the staff proposal and sticking just with "ask" (which the Commission deemed "essentially synonymous" with "request," *id.*), the FEC eliminated the definition's indirect component. This produced a narrowing construction, one that "mark[s] the boundary between permissible and impermissible solicitations," *id.*, leaving unregulated a "wide array of activity"—like the conduct in Shays's and Meehan's two hypotheticals—that the term "solicit" could plausibly cover. Whereas "solicit" might otherwise cover coded statements, not to mention winks and nods, the FEC, by limiting its rule to "affirmative verbalization or writing," has spared itself any need to scrutinize such exchanges. Nor will the FEC have any need to delve into "subjective" meaning indicated by context. Under the rule, it may simply determine whether the fundraiser in question made an explicit request.

Reinforcing this view, we note that the FEC's construction of its regulations comports with the most natural meaning of "ask." Of course, we can imagine describing Shays's and Meehan's hypothetical Senator as "asking" for money by saying "it's important that the party receive $100,000," just as we can imagine saying "my mother asked me to come home" when what she said was "I love it when you visit." But this is hardly

the most natural use of the word "ask," which ordinarily means "to call upon for an answer" or "to make a request"—terms implying a direct question or demand, rather than a statement of fact or opinion. *See Webster's Third New Int'l Dictionary* 128 (1993). Moreover, using only "ask" rather than a series of verbs would seem odd unless the FEC intended to narrow the statute's meaning to that word's principle definition—i.e., "calling for an answer" as opposed to "suggesting" or "indicating."

Thus, in proceeding with our *Chevron*/APA inquiry, we assume the regulations mean what the FEC's official explanation says they do, i.e., that the FEC definitions require an explicit direct request for money—an interpretation FEC counsel refused to disavow at oral argument. Adopting this same view, the district court deemed the FEC's definitions unreasonable under *Chevron* step two. According to the court, although the terms "solicit" and "direct" were not so clear as to preclude the regulations under *Chevron* step one, the rules' construction of these terms to cover only direct requests "'create[d] the potential for gross abuse,'" thus defying Congress's evident purpose of "divorc[ing] national political parties, as well as candidates for federal office and federal officeholders, from the nonfederal money business." 337 F. Supp. 2d at 74-76, 78-79 (quoting *Orloski*, 795 F.2d at 165). We agree, though we locate our holding under *Chevron* one, rather than two.

In undertaking our *Chevron* step one inquiry into "whether Congress has directly spoken to the precise question at issue," we employ "the traditional tools of statutory construction," *see Chevron*, 467 U.S. at 842-43 & n.9, including "examination of the statute's text, legislative history, and structure[,] as well as its purpose," *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (citations omitted). As the Supreme Court has emphasized, "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court

should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

Here, even setting context aside, we think "solicit" (if not also "direct") more naturally connotes an indirect request than does "ask," at least in the narrow sense of "asking" that the FEC's rule employs. To give an example, a charity brochure on starving children might well "solicit" though it doesn't "ask" in the sense of "calling for an answer." *Cf. Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) (considering it "evident" that the term "solicitation of orders" "includes, not just explicit verbal requests for orders, but also any speech or conduct that implicitly invites an order"). But in any event, although "'[s]olicit' can, of course, mean a variety of things," *Martin Tractor Co. v. FEC*, 627 F.2d 375, 383 (D.C. Cir. 1980), in the context of this case we find the FEC's narrow interpretation of that term (as well as "direct") implausible.

Reflecting "Congress's effort to plug the soft-money loophole," *McConnell*, 540 U.S. at 133, BCRA marshals "solicit" and "direct" as reinforcements for other, more straightforward prohibitions. Candidates may not "receive" or "spend" soft money, nor may they "solicit . . . , direct, [or] transfer" it—for themselves or anyone else. *See* 2 U.S.C. § 441i(e)(1). The same restrictions—spending, receiving, transferring, soliciting, directing—likewise apply to national parties. *See id.* § 441i(a). Further, BCRA surrounds these restrictions with yet more stopgaps, providing, for example, that even indirectly controlled entities count as "parties" for purposes of these restrictions, 2 U.S.C. § 441i(a)(2), and then "reinforc[ing]," *McConnell*, 540 U.S. at 133, the soft-money rules by requiring that certain state-party activities receive federal (i.e., non-soft-money) funding, 2 U.S.C. § 441i(b).

Given this context, and considering Congress's intent to shut down the soft-money system, we think it obvious that "solicit" and "direct" serve to reinforce BCRA's more direct prohibitions. Barred from spending and receiving unregulated funds, candidates and parties might switch to raising such money for friendly outsiders. So BCRA bans "soliciting" and "directing" as well.

The FEC's definitions fly in the face of this purpose because they reopen the very loophole the terms were designed to close. Under the Commission's interpretation, candidates and parties may not spend or receive soft money, but apart from that restriction, they need only avoid explicit direct requests. Instead, they must rely on winks, nods, and circumlocutions to channel money in favored directions—anything that makes their intention clear without overtly "asking" for money. Simply stating these possibilities demonstrates the absurdity of the FEC's reading. Whereas BCRA aims to shut down the soft money system, the Commission's rules allow parties and politicians to perpetuate it, provided they avoid the most explicit forms of solicitation and direction.

Although this context alone satisfies us that the FEC's narrowing construction violates congressional intent, two further considerations reassure us that Congress intended broader meanings for "solicit" and "direct." The first is BCRA's repeal of the "magic words" standard for issue advocacy. As noted earlier, whereas pre-BCRA law permitted unregulated financing of ads lacking "explicit words of advocacy of election or defeat of a candidate," *Buckley*, 424 U.S. at 43, BCRA adopts more robust standards for communication oriented towards elections, *see infra* at 52-53—a change understood to reflect Congress's judgment that the old standard was "functionally meaningless," *McConnell*, 540 U.S. at 193. Yet as the district court observed, the FEC's interpretation of "solicit" and "direct" is "not . . . unlike that under pre-BCRA FECA, where the 'express

advocacy' rule permitted labor unions and corporations to avoid regulation by simply avoiding *Buckley*'s magic words, which effectively permitted such groups to sidestep FECA's prohibitions." 337 F. Supp. 2d at 79. If imaginative advertisers are able to make their meaning clear without employing express terms like "vote for" and "vote against," savvy politicians will surely be able to convey fundraising desires without explicitly asking for money. We see little reason why Congress would have written BCRA to allow the latter practice while stamping out the former.

Second, as Shays and Meehan point out, the FEC has long construed "solicit" elsewhere in FECA as covering indirect requests. While allowing corporations and labor unions to create special accounts for political activity, FECA restricts "solicitation" of contributions to those accounts. *See* 2 U.S.C. 441b(b)(4). Interpreting this restriction, FEC advisory opinions have held that unions and companies may solicit funds merely by praising contributors, *see, e.g.*, FEC Advisory Op. 1979-13, or even just describing contribution procedures, *see, e.g.*, FEC Advisory Op. 1999-6. As the Commission's own campaign guide puts it, "solicitations" are not limited to "a straightforward request for contributions." FEC Campaign Guide for Corporations and Labor Organizations at 24 (2001). Although the FEC could of course reconsider these advisory rulings, and while "solicit" could perhaps carry different meanings in different contexts, this background reinforces our sense that Congress anticipated a similarly broad construction of that term here. *Cf. Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193-94 (2002) ("Congress's repetition of a well-established term generally implies that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations.").

For all these reasons, we hold that Congress has clearly spoken to this issue and enacted a prohibition broader than the

one the FEC adopted. In context, BCRA's terms "solicit" and "direct" cover indirect requests. Because the FEC's rule, according to the Commission's own explanation, does not, we shall affirm its invalidation. In doing so, we express no view regarding a further argument presented by Shays and Meehan—that to avoid statutory redundancy, "direct" must mean more than "ask in response," when "solicit" means "ask" plain and simple.

*Electioneering Communication*

Shays's and Meehan's third challenge relates to the FEC's regulatory definition of "electioneering communication"—a new BCRA concept that replaces the old "magic words" standard for issue ads. As noted earlier, in *Buckley* the Supreme Court, based on constitutional avoidance, construed key FECA provisions as applying only to "communications that include explicit words of advocacy of election or defeat of a candidate," i.e., "magic words" such as "vote for" and "vote against." *See* 424 U.S. at 43-44 & n.52, 80. This created a giant loophole. By simply avoiding express advocacy, corporations and labor unions, among others, could expend hundreds of millions of dollars in unregulated funds on broadcasts that appeared "functionally identical" to ordinary campaign advertising. *McConnell*, 540 U.S. 126-27. Now, BCRA provisions upheld against constitutional challenge in *McConnell*, *see id.* at 189-95, 203-12, bar corporations and unions (though not their PACs) from financing ads meeting the statutory definition of "electioneering communication," 2 U.S.C. § 441b(b)(2); *see also McConnell*, 540 U.S. at 204. Further, BCRA requires certain disclosures for electioneering communications, 2 U.S.C. § 434(f)(1)-(2), and, as noted earlier, such communications automatically qualify as FECA "contributions" when coordinated with a candidate, *id.* § 441a(a)(7)(C); *see also supra* at 41.

The key to these new restrictions is what counts as "electioneering communication" in the first place. As a general rule, the definition covers "any broadcast, cable, or satellite communication" that (1) "refers to a clearly identified candidate for Federal office," (2) "is made within" 60 days before a general election or 30 days before a primary, and (3) "is targeted to the relevant electorate." 2 U.S.C. § 434(f)(3). Certain communications are then expressly exempted, among them news stories, commentary, and editorials (unless the broadcaster is controlled by a political party or candidate). *See id.* § 434(f)(3)(B)(i). In addition, BCRA authorizes the FEC to craft exemptions, subject to certain limitations described below. *Id.* § 434(f)(3)(B)(iv).

In an exceedingly complex regulation, the FEC has laid out its interpretation of provisions defining "electioneering communication." Although the district court invalidated other aspects of this rule, only one point remains disputed: the interpretation of "made."

Recall that BCRA's definition applies only to communications "made within" specified time periods (i.e., 30 or 60 days before an election). Construing this phrase, the FEC's regulation defines "made" to mean "publicly distributed," 11 C.F.R. § 100.29(a)(2), and then defines "publicly distributed" to mean "aired, broadcast, cablecast or otherwise disseminated *for a fee* through the facilities of a television station, radio station, cable television system, or satellite system," *id.* § 100.29(b)(3)(i) (emphasis added). The italicized words are the rub. According to Shays and Meehan, nothing in the statute supports limiting "electioneering communications" to *purchased* transmissions. As the Congressmen see it, the statute applies equally to unpaid broadcasts, such as public service announcements. Indeed, they worry that sham PSAs could become the new sham issue ads—communications evading regulation though functionally indistinguishable from campaign

ads. To give an example used by the FEC in the very rulemaking here, supporters could "us[e] a PSA to associate a Federal candidate with a public-spirited endeavor"—say, a blood drive or veterans' support effort—"in an effort to promote or support that candidate." Electioneering Communications, 67 Fed. Reg. 65,190, 65,202 (Oct. 23, 2002). Indeed, given a friendly broadcaster willing to forgo its fee, supporters could even air unambiguous election aids, i.e., ads clearly identifying a federal candidate, targeting the relevant electorate, and appearing close to the election.

The district court found that the FEC's definition violated Congress's clearly expressed intent under *Chevron* step one. We agree. In effect, the Commission has taken the three parts of BCRA's standard—(1) candidate identification, (2) within 30 or 60 days, and (3) targeted at the electorate—and added a fourth: "for a fee." Nothing in the statute suggests that Congress contemplated such an element. Certainly, the word "made" carries no such connotation. When one says, "dinner is made," the implication is that dinner exists, not that someone paid for it. Likewise here, to say a "broadcast, cable, or satellite communication . . . is made" implies quite simply that the communication exists—i.e., that it was transmitted—not that someone paid a fee to make the transmission happen. Nor does the context add any ambiguity. To the contrary, BCRA says, "communication . . . made within" a certain time-frame, i.e., 60 days before a general election or 30 days before a primary. Obviously, the temporal reference point—when the communication "is made"—is the date of transmission, for that is the point when the ad may influence the election. But given that focus, it makes no sense to say that the communication is "made" only if someone paid a fee, an event that likely occurred earlier. The point, again, is simply that the transmission occurred.

Attempting to concoct ambiguity, the FEC protests, "There is simply no mention of funding anywhere in the definition." Appellant's Br. at 41-42. True, but so what? The already capacious U.S. Code would require even more volumes if Congress could be clear only by ruling out every possible limitation on statutory language. *See, e.g.*, *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (rejecting the claim "that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.*, when the statute is not written in 'thou shalt not' terms)"). When Congress bans possession of a firearm or cocaine, we hardly scratch our heads and ask, "Gee, maybe they meant possession for a fee?" By the same token, when BCRA says "made," we presume, absent compelling indication otherwise, that it means "made" and not "made for a fee."

Of course, BCRA does permit FEC-crafted exemptions, and one might characterize this rule as such, given that it effectively excludes unpaid broadcasts from the definition. To be sure, the FEC doesn't characterize its action this way. Instead, presumably because the district court held that the FEC's action exceeded the plain text of BCRA's exemption clause, *see* 337 F. Supp. 2d at 128-29, the Commission insists that its rule represents an interpretation of the statute. No matter. As the district court explained and as Shays and Meehan argue, the FEC's rule far exceeds any exemption BCRA would permit, for the statute specifically provides that "a communication may not be exempted" if it falls within another provision describing "public communication[s] that refer[] to a clearly identified candidate for Federal office . . . and that promote[] or support[] a candidate for that office, or attack[] or oppose[] a candidate for that office." *See* 2 U.S.C. § 434(f)(3)(B)(iv) (referencing *id.* § 431(20)(A)(iii)). Exempting all fee-free communications regardless of content, the FEC's rule makes no pretense of following this command. To the contrary, as noted earlier, it

permits broadcasters to run ad after ad lambasting or applauding federal candidates, right up to election day, provided the broadcaster sacrifices its bottom line for its beliefs. Because BCRA's limitation on the exemption power forecloses exactly this possibility, the FEC's rule again conflicts with Congress's unambiguous intent.

Rather than focusing on these textual problems, the FEC's briefs emphasize the "risk" that without its limiting construction, BCRA's electioneering communication restrictions could chill "entertainment, educational, and documentary programs that mention or portray a federal candidate only incidentally," as well as PSAs featuring federal candidates and "encouraging citizens to donate blood, for example." Appellant's Br. at 41, 42-43, 44. Although this rationale is hardly apparent in the rulemaking record, *see* 67 Fed. Reg. at 65,192-93 ("bas[ing]" the rule "on the legislative history of BCRA"), and although in any event we need not consider it given our *Chevron* one holding, we nevertheless think it worth pointing out that avoiding chilling particular types of communication could hardly justify the FEC's broad exclusion of *all* unpaid broadcasts, regardless of content. Furthermore, because BCRA already includes an express exemption for "communication[s] appearing in a news story, commentary, or editorial," 2 U.S.C. § 434(f)(3)(B)(i), no further exemption was necessary to avoid chilling those. As for PSAs, excluding federal candidates from broadcasts promoting blood drives and other worthy causes for 90 days out of every two years (30 days before the primary plus 60 days before the general election) would hardly seem unreasonable given that such broadcasts could "associate a Federal candidate with a public-spirited endeavor in an effort to promote or support that candidate"—a risk the FEC itself acknowledged, in the very same rulemaking, in justifying its refusal to promulgate a general exemption for PSAs (whether paid or unpaid), *see* 67 Fed. Reg. at 65,202.

To sum up, as an interpretation of "electioneering communication," the regulation contradicts BCRA's plain text and thus fails *Chevron* step one. Insofar as it instead constitutes an exemption, it runs roughshod over express limitations on the Commission's power, thus again flunking *Chevron* one. Accordingly, we shall affirm the district court's invalidation of this rule.

*Salary Allocation*

Yet another new BCRA concept is "federal election activity" ("FEA" for short). Central to Congress's effort to eliminate soft money influence, this concept identifies activities that state and local party organizations must finance with hard money. Among them, as mentioned previously, are voter registration drives within 120 days of an election, 2 U.S.C. § 431(20)(A)(i), and "public communications" attacking or supporting identified federal candidates (whether or not state and local candidates are also "mentioned or identified"), *id.* § 431(20)(A)(iii). Of course, even before BCRA, FECA's "expenditure" definition covered spending "for the purpose of influencing" federal elections, including spending by state and local parties. *See id.* § 431(9)(A); *McConnell*, 540 U.S. at 118-19. But as mentioned earlier, FEC regulations governing activities with combined state and federal implications—among them, voter registration drives and generic party advertising—allowed generous use of soft money by state and local parties. *See McConnell*, 540 U.S. at 123 & n.7; *see also supra* at 5. BCRA's FEA provisions supplant these regulations, making clear that the listed "mixed purpose" activities must be financed with federally regulated money. *See* 2 U.S.C. § 441i(b).

The issue before us relates to one category of FEA: salaries for employees devoting more than 25% of their paid time to federal elections. *See id.* § 431(20)(A)(iv). In any month during

which a state or local party employee's work crosses the 25% threshold, the employee's *entire* salary counts as FEA, thus requiring the party to pay that salary exclusively with federally regulated funds. *See id.* §§ 431(20)(A)(iv), 441i(b). In its regulations, the FEC faithfully implemented this restriction, declaring that such salaries "must be paid only with Federal funds." 11 C.F.R. § 300.33(c). But the FEC also drew an inference that Shays and Meehan dispute. With respect to all other salaries, i.e., those for employees devoting 25% of their time or less to federal activities, the FEC eliminated any allocation requirement, thus freeing state and local parties to pay such employees' salaries *entirely* with soft money. *Id.* §§ 106.7(c)(1), (d)(1), 300.33(c)(2). Thus, under the Commission's rule, such parties may require every one of their employees to work as much as quarter time—a day a week or more—on federal elections without needing any federally regulated funds for those salaries.

As stated in the official explanation, the FEC views this rule on salaries *below* the 25% mark as an "implication" of BCRA's standard for salaries *above* that threshold. *See* Prohibited & Excessive Contributions: Non-Federal Funds or Soft Money, 67 Fed. Reg. 49,064, 49,078 (July 29, 2002). "Congress appears to have concluded," the FEC wrote, "that salaries for employees spending 25% or less of their time on activities in connection with a Federal election or on Federal election activities do not have to be paid from any mix of Federal funds." *Id.* Shays and Meehan disagree. Absent any change in FECA's "expenditure" definition, they argue, spending "for the purpose of influencing" federal elections, including state party salaries, must still be allocated. While holding that BCRA did not unambiguously foreclose the Commission's rule, the district court concluded that because state parties could simply spread federal work over multiple 25%-federal employees, exclusive use of unregulated funds for such salaries would "compromise the Act's purposes of preventing circumvention of its national party committee

nonfederal money ban and stemming the flow of nonfederal money into activities that impact federal elections." 337 F. Supp. 2d at 114. For this reason, the district court invalidated the rule under *Chevron* step two. Again, we shall affirm.

First, to the extent Shays and Meehan assert a BCRA violation under *Chevron* step one, we join the district court in rejecting their position. As the district court explained, the statute "speaks only to how state, district or local political party committees should fund the activities of their employees who spend *more* than 25 percent of their paid time on Federal election activities." *Id.* at 113. It says nothing at all about salaries below that threshold, much less anything unambiguous, as required by *Chevron* one. But for the very same reason—i.e., because BCRA says nothing at all—the statute's 25% provision also does not carry the "implication" the FEC attributes to it. In fact, far from suggesting that 25%-or-less salaries may be funded entirely with unregulated money, as the FEC believes, the statute, by singling out certain employees (i.e., those above the 25% level), suggests that others' salaries remain subject to preexisting law.

The statutory context confirms this reading. No exhaustive canvass of federally-oriented electoral costs, BCRA's FEA definition covers just four categories, all of which involve activities with combined state and federal implications that could thus be used to disguise federally-oriented activities as a state-related campaign. We have already mentioned three of the categories—above-25% salaries, voter registration within 120 days of an election, and ads attacking or supporting federal candidates in combination with state ones. *See* 2 U.S.C. §§ 431(20)(A)(i), (iii), (iv). The fourth comprises "voter identification, get-out-the-vote activity, or generic campaign activity in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot)."

*Id.* § 431(20)(A)(ii); *see also id.* § 431(20)(B) (exempting certain expenditures such as costs for buttons, bumper-stickers, and local party conventions from all four categories of FEA). As a general rule, BCRA requires exclusive hard money financing for each of these four activities. *See id.* § 441i(b)(1). The only exception, applicable only to limited types of FEA and never to above-25% salaries, is the "Levin Amendment"—a provision (described below) that permits partial financing of certain generic campaign activity with funds raised subject to special controls. *See id.* § 441i(b)(2); *see also McConnell*, 540 U.S. at 161-64; *infra* at 62-64.

The purpose of these restrictions, as *McConnell* says of the 25% rule, is "prophylactic." *See* 540 U.S. at 170-71. Before BCRA, donors could lavish soft money on generic state party advertising and pre-election voter registration drives, notwithstanding the obvious benefits such efforts would have for federal candidates. Now, outside the carefully circumscribed limits of the Levin Amendment, such activities must be financed entirely with federal money, even though they relate to state as well as federal elections. *Cf. id.* at 166 (describing the FEA provisions as "captur[ing] some activities that affect state campaigns for nonfederal offices"). Likewise, before BCRA, under FEC allocation rules, *see supra* at 5, state parties could pay their workers largely with soft money. Now those above the 25% level must be paid entirely with hard funds—again, even though their activity benefits state as well as federal candidates. Given this prophylactic thrust—sweeping *state* activities into the federal orbit due to the risk of concealed federal purpose—nothing in the FEA definition's structure suggests congressional intention to deregulate *federal* activity. The FEA provisions supplement, not supplant, preexisting controls.

Indeed, the FEC's rules acknowledge as much. Despite categorically exempting 25%-or-less salaries from allocation, FEC regulations continue to require that "administrative costs"

be spread between hard and soft money accounts. *See* 11 C.F.R. § 106.7(c)(2). As the Commission explained in the very same statement promulgating the 25%-or-less rule, "nothing in BCRA or the legislative history suggests that Congress intended the Commission to abandon its longstanding allocation requirement for these expenses." 67 Fed. Reg. at 49,078. Likewise subject to allocation are fundraising costs associated with joint state/local and federal campaigns, *see* 11 C.F.R. § 106.7(c)(4), as well as expenses (apart from salaries and wages) for "voter identification, voter registration, and get-out-the-vote drives, and any other activities that urge the general public to register or vote, or that promote or oppose a political party . . . that do not qualify as Federal election activities," *id.* § 106.7(c)(5).

These regulations clearly rest on the same BCRA interpretation that we have articulated—that while imposing additional constraints on FEA activities, BCRA makes no change to preexisting restrictions on non-FEA expenditures. But if "nothing in BCRA" evinces congressional intent to deregulate non-FEA expenses like administrative and fundraising overhead, then neither does BCRA support exclusion of non-FEA salaries, i.e., those for employees devoting up to 25% of their time to federal elections. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. __, __ (2005) (describing "[a]gency inconsistency" as a possible "reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA]"). Indeed, the salary rule appears particularly irrational given the FEC's recognition that costs for voter registration, get-out-the-vote drives, and generic party advertising—all matters, like salaries, that the FEA definition specifically addresses—may require allocation even when the activities "do not qualify" as FEA. *See* 11 C.F.R. § 106.7(c)(5).

In sum, the FEC has construed a BCRA provision sweeping *state* activities within FECA as an excuse to punt *federal*

activities outside it. Because this "implication" from the statute makes no sense, and because the Commission gave no other justification for its rule, the regulation exempting 25%-or-less salaries from allocation is arbitrary and capricious. We shall therefore affirm the district court's invalidation of this rule as well.

To be clear, because we thus rely on the APA rather than *Chevron*, nothing in our holding necessarily precludes the FEC from remedying deficiencies in its explanation and repromulgating this rule on remand, though we are skeptical that it may do so. Answering the district court's concerns about potential abuse, the FEC suggested in its briefs here that state and local parties may possess neither "an incentive" nor "the necessary flexibility in their workloads and staffing" to spread federal work among under-25%-federal employees. Appellant's Br. at 36 n.9; *see also* Reply Br. at 18. But why so? Given the massive soft money sums infused into pre-BCRA elections (nearly half a billion dollars in 2000 alone), it strikes us as quite plausible that wealthy donors would swallow costs for increased state and local campaigning, were the result an army of workers devoting more than a day a week to federal elections. Should the FEC wish to adhere to its current view in future rulemaking, it must summon more substantial support than the conclusory assertions presented to us.

## *Levin Funds*

Shays's and Meehan's final challenge involves an exception to an exception. As noted in the last section, although "federal election activity," as defined in BCRA, generally requires hard money, the statute contains an exception—the "Levin Amendment." *See* 2 U.S.C. § 441i(b); *McConnell*, 540 U.S. at 162-63. That provision allows state and local parties to finance certain types of FEA with money, called "Levin funds," subject to far less onerous controls than those for hard money. *See*

*generally McConnell*, 540 U.S. at 162-63. The catch is that the party must "allocate" these FEA costs between Levin funds and hard money. *See* 2 U.S.C. § 441i(b)(2). But under a regulatory exception to this exception—one Shays and Meehan challenge—party organizations need not allocate if they spend no more than $5,000 total on allocable expenditures, an amount the Commission considers de minimis. *See* 11 C.F.R. § 300.32(c)(4); 67 Fed. Reg. at 49,097.

To understand the FEC's rationale and Shays's and Meehan's objection, yet more detail about this complex statute is (unfortunately) necessary. First, "Levin funds" are a sort of semi-soft money. Available to state and local party organizations in sums up to $10,000 per donor per year, Levin funds are exempted from federal disclosure requirements and restrictions (though not from state law). *See* 2 U.S.C. § 441i(b)(2)(B)(iii); *McConnell*, 540 U.S. at 162-63. Party entities using Levin funds must raise them on their own, without help from national parties or even state and local affiliates. *See* 2 U.S.C. §§ 441i(a), (b)(2)(B)(iv), (e); *McConnell*, 540 U.S. at 163-64. Furthermore, parties may use Levin funds only for certain types of FEA—specifically, generic party campaigning, get-out-the-vote activity, and voter identification and registration drives (activities covered by two of the four FEA categories), *see* 2 U.S.C. § 441i(b)(2)(A) (referencing *id.* § 431(20)(A)(i)-(ii))—and under no circumstances may Levin funds finance expenditures "refer[ring] to a clearly identified candidate for Federal office," 2 U.S.C. §§ 441i(b)(2)(B)(i). *See generally McConnell*, 540 U.S. at 163. Nor may they bankroll any "broadcasting, cable, or satellite communication," save those that "refer[] solely to a clearly identified candidate for State or local office." 2 U.S.C. § 441i(b)(2)(B)(ii).

Thus, a typical Levin Amendment activity might involve a generic effort by some state or local party organization to register voters and turn them out for an election where both state

and federal offices are at issue. The party entity could finance that activity in part with money raised in $10,000 contributions. Usual hard money requirements would not apply, but, as noted earlier, the party would need to "allocate" the vote drive's costs between hard money accounts and the "Levin funds" raised in these up-to-$10,000 donations.

By what criteria do parties "allocate"? Presumably the goal is to approximate the relative state and federal components of the activity (assigning Levin funds to the former and hard money to the latter), but much as with the "coordinated communication" issue discussed earlier, BCRA leaves the question open. That is, rather than prescribing allocation rules itself, BCRA simply refers to "regulations prescribed by the Commission." 2 U.S.C. § 441i(b)(2)(A). So the Commission promulgated rules, and these rules, in addition to providing guidance on allocation, include the $5,000 "de minimis" exemption at issue in this appeal.

Our cases recognize that agencies may promulgate de minimis exemptions to statutes they administer. *See, e.g.*, *Ass'n of Admin. Law Judges v. FLRA*, 397 F.3d 957, 961-62 (D.C. Cir. 2005); *Envtl. Def. Fund, Inc. v. EPA*, 82 F.3d 451, 466 (D.C. Cir. 1996); *Ala. Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979). Predicated on the notion that "the Congress is always presumed to intend that pointless expenditures of effort be avoided," such authority "is inherent in most statutory schemes, by implication." *Ass'n of ALJs*, 397 F.3d at 962 (internal quotation marks omitted). But there are limits. First, de minimis exemption power does not extend to "extraordinarily rigid" statutes. *See id.* at 962; *EDF*, 82 F.3d at 466. By promulgating a rigid regime, Congress signals that the strict letter of its law applies in all circumstances, thus rebutting the presumption against "pointless" applications. Second, even absent rigidity, "[t]he authority to create these exceptions does not extend to 'a situation where the regulatory function does

provide benefits, in the sense of furthering regulatory objectives, but the agency concludes that the acknowledged benefits are exceeded by the costs.'" *Public Citizen v FTC*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) (quoting *Ala. Power*, 636 F.2d at 360-61) (emphasis removed).   Instead, situations covered by a de minimis exemption must be truly de minimis.  That is, they must cover only situations where "the burdens of regulation yield a gain of trivial or no value," *EDF*, 82 F.3d at 466 (internal quotation marks omitted), for otherwise the exemption reflects impermissible "second-guess[ing] [of] Congress's calculations," *Public Citizen*, 869 F.2d at 1557, as opposed to avoidance of "absurd or futile results," *EDF*, 82 F.3d at 466 (internal quotation marks omitted).

Apparently attempting to satisfy these requirements, the FEC gave three reasons for its exemption here.  First, the Commission attempted to show that the Levin allocation rule is not "extraordinarily rigid."  *See* 67 Fed. Reg. at 49,097 (observing that "the reporting requirements for Federal election activity contain an exception for activity below $5,000 in the aggregate in a calendar year" and therefore concluding that "Congress did not take a rigid approach to low levels of Federal election activity") (citing 2 U.S.C. § 434(e)(2)(A)).  We need not consider that argument, however, for even if the FEC is correct on this point, its remaining two rationales give no assurance that exempted spending—i.e., Levin expenditures totaling $5,000 or less in a given year for a given party organization—is in fact de minimis.

In the first of the two remaining rationales, the FEC observed, "[T]he Commission is particularly sensitive to the nature of the Federal election activity to which this provision applies:  Grassroots activities for which references to Federal candidates are prohibited."  67 Fed. Reg. at 49,097.  "There is a far weaker nexus," the Commission went on, "between Federal candidates and this category of Federal election activity than

other types of Federal election activity for which Levin funds are prohibited." *Id.* The FEC's point, we take it, is that the Levin Amendment includes only "grassroots" FEA categories (e.g., voter registration drives and generic party campaigning), and that as such, the included FEA categories involve a "weaker nexus" with federal candidates than those that Congress excluded (e.g., over-25% salaries and public communications referring to specific candidates).

Although this distinction may explain the pattern of included and excluded FEA types—an issue we need not address—Congress's rationale for *including* activities in the Levin Amendment obviously affords no justification for *excluding* them from Levin allocation, the very form of regulation Congress chose. *See Public Citizen*, 869 F.2d at 1557 (observing that de minimis exemptions may not "second-guess Congress's calculations"). Yet that is precisely the effect of the FEC's exemption with respect to Levin spending totaling $5,000 or less in a given year for a given party entity. To put the same point somewhat differently, because the FEC's observations (that covered activities are "grassroots" and bear a "weaker nexus") relate to Levin FEA in general, these rationales would apply equally to $50,000 or even $50,000,000 in Levin spending—sums Congress could hardly have deemed "trivial," *EDF*, 82 F.3d at 466.

The FEC's final rationale fares no better. Observing that $5,000 is only half of $10,000, the amount each Levin contributor may "donate (subject to State law) to each and every State, district, and local party committee," the Commission declared: "[T]here is no danger that allowing a committee to use entirely Levin funds for allocable Federal election activity that aggregates $5,000 or less in a calendar year will somehow lead to circumvention of the amount limitations set forth in [the statute]." 67 Fed. Reg. at 49,097. This is certainly true. A party with only $5,000 total *expenditures* can hardly evade the

$10,000 "amount limitation" on *contributions*. *Id.* But the point of Levin allocation—the subject-matter of this exemption—is to restrict spending, not donations. Specifically, allocation requires state parties to raise hard money for the federal component of mixed-purpose activities, despite using Levin funds for the remainder. Thus, again, to establish that some level of FEA spending—whether $5,000, $50,000, or $500—is de minimis, the FEC must demonstrate that efforts below that level have "trivial or no" impact on federal elections. *See EDF*, 82 F.3d at 466. The fact that donors could contribute more than that amount to the *state* component of such activities does nothing to reassure us that the *federal* component is thus insignificant. Nor does $5,000 strike us as an obviously trivial amount, considering that donors could give that amount to each and every state, district, and local party organization—an observation the FEC itself made, *see* 67 Fed. Reg. at 49,097.

Thus, even assuming the Levin Amendment is flexible enough to permit de minimis exclusions, the record here presents no coherent justification for the specific exemption the FEC chose. Accordingly, the Commission's action again falls short of APA standards, so again we shall affirm the district court's invalidation.

## IV.

As the Supreme Court (rather fatalistically) observed in *McConnell*, "Money, like water, will always find an outlet." 540 U.S. at 224. Offered there as a reason for "no illusion that BCRA will be the last congressional statement on [campaign finance]," *id.*, this comment serves equally well here to illustrate the importance of faithfully implementing the statute Congress has passed. For if regulatory safe harbors permit what BCRA bans, we have no doubt that savvy campaign operators will exploit them to the hilt, reopening the very soft money floodgates BCRA aimed to close. Because the rules at issue in

this appeal either fall short of Congress's mandate or lack record support showing otherwise, we affirm their invalidation by the district court.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

I dissent from the majority opinion because I believe the appellees lack standing to bring this action under Article III of the United States Constitution. In *McConnell v. FEC*, 540 U.S. 93 (2003), the United States Supreme Court iterated the "three requirements that constitute the 'irreducible constitutional minimum' of standing":

First, a plaintiff must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent." Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of–the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] some third party not before the court.' " Third, a plaintiff must show the " 'substantial likelihood' that the requested relief will remedy the alleged injury in fact."

540 U.S. at 225-26 (alteration original; internal citations omitted). The appellees have failed to make this minimum showing because they have not identified an actual or imminent, concrete injury-in-fact that is caused by the challenged regulations implementing the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, 116 Stat. 81 (2002). Instead they speculate that they *may* suffer vaguely described injuries at some future time. *See* Decls. of Shays and Meehan ¶¶ 6, 7, 8 (averring each appellee will be "impact[ed]" "as a candidate who runs in elections that *could be* affected" by soft-money funding of "state and local activities that affect federal elections," each "will be *open to* attack . . . by groups seeking to evade the contribution limits, source prohibitions, and disclosure requirements imposed by Congress" and opponents "will be *able* to interact and coordinate . . . . in [unidentified] ways that evade the contribution limits, source prohibitions, and disclosure requirements of federal law") (emphases added). Or they complain of the subjective indignity of campaigning in a purportedly tainted electoral environment. *See id.* ¶¶ 4, 5 (averring each "will be forced" to run for re-election "in a

system that is widely perceived to be, and [he] believe[s] in many respects will be, significantly corrupted by the influence of special-interest money," each "will face the strong risk that unregulated soft money contributions will again be used in an attempt to influence federal elections in which [he is] a candidate" and the soft-money contribution regulations "will affect the perception the public will form of me, my fellow office-holders, and fellow party members"). Such wispish injury claims fall far short of the injury showing required for Article III standing. *See Allen v. Wright,* 468 U.S. 737, 751 (1984) (to satisfy constitutional component of standing doctrine "injury alleged must be . . . distinct and palpable, and not abstract or conjectural or hypothetical") (internal quotations omitted). The majority attempts to fill the gaps in the appellees' allegations by invoking two standing doctrines—conflated under the novel heading "illegal structuring of a competitive environment," maj. op. 12, 13—which neither the Supreme Court nor we have ever before applied in a similar context. In its eagerness to manufacture standing, the majority stretches both doctrines past their breaking points.

First, the majority finds standing based on the "procedural rights" cases. Under the procedural rights doctrine, courts have lowered the standing bar somewhat "in cases in which a party 'has been accorded a procedural right to protect his concrete interests' " before an agency so that "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7 (1992)). In *Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255 (D.C. Cir. 2004), on which the majority relies, we applied the procedural rights doctrine to conclude that the Electric Power Supply Association (EPSA), a national trade association, and its members, which

"routinely appear before FERC in contested hearings," 391 F.3d at 1262, had standing to challenge a regulation creating an exception to the Sunshine Act's statutory prohibition on *ex parte* communications in agency proceedings, *see* 5 U.S.C. § 557(d)(1)(A), (B). The court reasoned that to establish standing, the plaintiffs did not need to show any certainty of financial loss because, "[a]s regular participants in contested FERC hearings, EPSA and its members have a right, protected by the Sunshine Act's proscription against *ex parte* communications, to 'fair decisionmaking' by the Commission." 391 F.3d at 1262 (quoting *Prof'l Air Traffic Controllers Org. v. FLRA,* 685 F.2d 547, 563 (D.C. Cir. 1982)). Similarly, in cases challenging an agency's refusal to prepare an environmental impact statement regarding a proposed federal project, we and other courts have found that a landowner whose property is threatened by the project has standing to challenge the agency's refusal based on the Congress's intent to protect the landowner's procedural right to an environmental impact statement from the agency. *See, e.g.*, *Wyo. Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 51 (D.C. Cir. 1999); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7 (1992) ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."). The majority finds such cases "analogous to" this one. Maj. op. 12. The analogy does not hold up.

In *Electric Power*, EPSA had standing to challenge the regulation because it was "seeking to enforce procedural requirements designed to protect [its] concrete interest in the outcome of hearings to which EPSA is a party." 391 F.3d at 1262. EPSA enjoyed a procedural right to an administrative proceeding free from *ex parte* communications because it was

the beneficiary of one of the two interests underlying the Sunshine Act—to ensure disclosure " 'as an instrument of fair decisionmaking,' " for " 'only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered.' " *Id.* (quoting *Prof'l Air Traffic Controllers Org.,* 685 F.2d at 563). As the Supreme Court explained in *Defenders of Wildlife,* " 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." 504 U.S. at 573 n.7. The appellees do not qualify for this special relaxation of the usual injury standard for three reasons.

First, in the procedural rights cases, the courts have found a party has standing to challenge an agency decision which deprives the challenger of a procedural right that the Congress intended to protect *in proceedings before the same agency. See Committee for Full Employment v. Blumenthal*, 606 F.2d 1062, 1065 n.11 (D.C. Cir. 1979) ("On many occasions we have reviewed agency action or inaction at the request of a party who alleged that its procedural rights (as created either by the agency's own regulations, or the Administrative Procedure Act) had been violated."). In *Electric Power*, for example, we concluded that the EPSA and its members had standing to seek review of the decision *by the Federal Energy Regulatory Commission* to permit *ex parte* communication *in its own proceedings* which the Congress had intended to prohibit in the Sunshine Act in order to protect the right of fair decisionmaking *in proceedings before the Federal Energy Regulatory Commission. See Electric Power*, 391 F.3d at 1262 ("As regular participants *in contested FERC hearings*, EPSA and its members have a right, protected by the Sunshine Act's proscription against *ex parte* communications, to 'fair decisionmaking' *by the Commission*.") (emphasis added). Similarly, in the cases challenging an agency's refusal to prepare an environmental

impact statement regarding a proposed federal project, to which the Supreme Court alluded in *Defenders of Wildlife*, *see* maj. op. 23-24, courts have found that a landowner whose property is threatened by the project has standing to challenge the agency's refusal based on the Congress's intent to protect the landowner's procedural right to obtain an environmental impact statement *from the agency undertaking the project*. Here, there is no such connection between the FEC or its rulemaking proceeding and the "procedural right" allegedly denied the appellees. The majority finds the appellee congressmen have standing to challenge the FEC's rulemaking procedure based not on a right to some guaranteed procedural protection before the Commission but rather on an "interest in 'fair' reelection fights" in future public elections. *See* maj. op. 23. This unprecedented reliance on a right independent of any agency proceeding turns the procedural rights doctrine on its head and creates a wholly new and insupportable theory of standing.

Second, even assuming candidates could have standing to challenge an agency proceeding based on a procedural right available and violable only in a future election campaign, BCRA accords no such special right to the appellees or to any other candidate[1] because BCRA's requirements were not designed to

---

[1]I know of no authority to support the majority's suggestion, maj. op. 19, that if the appellees come within BCRA's "zone of interests" for prudential standing under the APA—a requirement the majority acknowledges is " '[n]ever especially demanding,' " maj. op. 9 (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004)— they necessarily have standing under Article III as well. *See Bennett v. Spear*, 520 U.S. 154, 162 (1997) (zone of interests requirement is part of "a set of prudential principles that bear on the question of standing" "[i]n addition to the immutable requirements of Article III"). It is true that the Congress "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," *Linda R.S. v. Richard D.*, 410 U.S. 614, 617

protect any interest, much less a concrete interest, belonging to a candidate in his capacity as candidate (as opposed to his capacity as voter). *See Fla. Audubon Soc'y*, 94 F.3d at 658 ("According to *Defenders of Wildlife,* a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement *only if* that requirement was 'designed to protect some threatened concrete interest' of the plaintiff." (quoting *Defenders of Wildlife*, 504 U.S. at 573 n. 8; emphasis added)). In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court determined that the "primary purpose" of the Federal Election Campaign Act of 1971 (FECA), which BCRA amends, was " 'to limit the actuality and appearance of corruption resulting from large individual financial contributions,' " *McConnell*, 540 U.S. at 120 (quoting *Buckley*, 424 U.S. at 26), by which "the integrity of our system of representative democracy is undermined," *Buckley*, 424 U.S. at 26-27. The *Buckley* Court found, the *McConnell* Court noted, that FECA's substantive contribution limits "serve[] an interest in protecting 'the integrity of our system of representative democracy.' " 540 U.S. at 120 (quoting *Buckley*, 424 U.S. at 26-27). Those BCRA provisions which may be considered "procedural"—that is, the provisions governing disclosure, recordkeeping and reporting—"vindicate[] three important interests: providing the electorate with relevant information about the candidates and

---

n.3 (1973), *quoted at* maj. op. 19, but to do so it must under *Electric Power* and the other procedural rights cases have "designed" the statute with the purpose to confer a right or benefit on the party asserting the right. *See also infra* pp. 9-10 (discussing competitive injury standing and need for legislative intent to confer it). This legislative purpose standard is more stringent than the "zone of interests" inquiry in which "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987) (analyzing zone of interests to establish *prudential* standing).

their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act." *McConnell*, 504 U.S. at 121 (citing *Buckley*, 424 U.S. at 66-68). None of these interests accrues to candidates *qua* candidates. The first two plainly benefit the general electorate; as the Court explained in *Buckley*, "[a] public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Buckley v. Valeo*, 424 U.S. at 67. As for the third, "recordkeeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations," *Buckley*, 424 U.S. at 67-68, thereby serving FECA's primary—public—interest in reducing corruption and its appearance by limiting contributions. Thus, BCRA's procedural provisions were designed to protect only the rights of voters generally to be informed about candidates and to exercise their franchise in an electoral system untainted (or less tainted) by corruption. They were not designed to benefit or protect candidates running for office. Because each congressman appellee is "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," he "does not state an Article III case or controversy." *Defenders of Wildlife*, 504 U.S. at 573-74. In short, he has no more standing than any other voter—which is to say none.[2]

To support a candidate's standing to challenge a campaign finance law violation under the procedural rights doctrine, the majority cites the example in *Defenders* of a landowner who has

---

[2]The majority offers no support for its bald statement that BCRA "*specifically* protects the interest in fair reelection contests that Shays and Meehan assert." Maj. op. 19 (emphasis added).

a procedural right to challenge an agency's failure to prepare an environmental impact statement regarding a proposed dam on land adjacent to his own. But there is a key distinction. The landowner has a concrete, particularized claim—beyond the general public's—to the interest which the environmental assessment requirements were designed to protect: his particular corner of the environment may be adversely affected by the dam because of its proximity. Thus, he has standing "even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Defenders of Wildlife*, 504 U.S. at 573 n.7. A candidate for public office, however, has no such special claim to the interest advanced by BCRA—namely, preserving the integrity of our system of government by eliminating corruption. With regard to this interest, he is like one of those "persons who live (and propose to live) at the other end of the country from the dam" and therefore "have no concrete interests affected." *Defenders of Wildlife*, 504 U.S. at 573 n.7.[3]

Finally, to the extent that BCRA creates any procedural protections (and I would be reluctant to characterize BCRA's disclosure, recordkeeping and reporting requirements as "protections" for candidates), it is not the regulations' procedural requirements that cause the appellees' alleged injuries but rather the purported relaxation of BCRA's substantive restrictions on contributions and expenditures. *See supra* pp. 1-2 (quoting from the appellees' declarations).

---

[3]In this respect, the majority's characterization of *Defenders'* persons living "at the other end of the country" as "a far cry from" from the appellees is wrong. *See* maj. op. 17-18. The appellees are in the same position as any voter and have no more personal stake in enforcing BCRA than *Defender*s' remote landowner would in enforcing environmental assessment requirements.

In addition to the procedural rights cases, the majority also finds standing based on a line of cases establishing "the rule . . . that when [a] particular statutory provision invoked [] reflect[s] a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision." *Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 6 (1968) (citations omitted). The majority's competitive standing theory also suffers from three fatal defects.[4]

First, as I just explained, BCRA does not "reflect a legislative purpose to protect a competitive interest" of the appellees; for

---

[4]In the past we have consistently viewed competitor standing in the political arena with skepticism. *See Gottlieb v. FEC*, 143 F.3d 618, 620 (D.C. Cir. 1998) ("As to AmeriPAC's 'political competitor' theory, we have never completely resolved this 'thorny issue.' " (quoting *Common Cause v. FEC,* 108 F.3d 413, 419 n.1 (D.C. Cir. 1997); citing *Akins v. FEC,* 101 F.3d 731, 737 (D.C. Cir. 1997) (en banc), *vacated,* 524 U.S. 11 (1998); *Fulani v. Brady,* 935 F.2d 1324 (D.C. Cir. 1991)). In *Gottlieb*, on which the majority relies, maj. op. 16, the court rejected the competitive standing claim of a political action committee challenging a candidate's receipt of federal matching funds, citing our decision in *Fulani*, in which we had similarly rejected a third party candidate's challenge to the tax exempt status of a presidential debate sponsor. The *Gottlieb* court noted that in *Fulani* "[w]e *speculated* that '*[a]rguably*' Fulani would have had standing 'if the IRS were depriving Fulani of a benefit that it afforded to others similarly placed.' " 143 F.3d at 621 (quoting *Fulani,* 935 F.2d at 1328) (emphases added). I do not agree with the majority that the court's finding that the plaintiff *lacked* standing, particularly in light of the quoted language, "supports applying competitive standing to politics as well as business." Maj. Op. 16. Even assuming, however, that competitive injury standing is viable in the political context, the appellees are, like the plaintiffs in *Gottlieb* and *Fulani,* "not in a position," *Gottlieb*, 143 F.3d at 620, to claim competitive standing because, as I explain below, they have not alleged a competitive injury.

the provisions the appellees seek to enforce are "in no way concerned with protecting against competitive injury." *Hardin*, 390 U.S. at 6 (explaining cases in which court found no standing notwithstanding existence of competitive economic injury).

Second, the Commission's regulations have not caused the appellees a competitive injury. In *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970), cited at maj. op. 14, the Supreme Court found sufficient injury-in-fact under Article III because the petitioners experienced increased competition for their customers as a result of the challenged government action.[5] The Supreme Court held that the petitioners, data processing service providers, had standing to challenge a ruling by the Comptroller of the Currency that authorized national banks to provide data processing services to other banks and to bank customers because the petitioner "not only allege[d] that competition by national banks in the business of providing data processing services might entail some future loss of profits for the petitioners, they also allege[d] that respondent American National Bank & Trust Company was performing or preparing to perform such services for two customers for whom petitioner Data Systems, Inc., had previously agreed or negotiated to perform such services." 397 U.S. at 152. As the majority acknowledges, however, the appellees have suffered no increased competition as a result of the Commission's regulations which "create neither more nor different rival candidates." Maj. op. 14. The majority also concedes that the regulations offer no "special benefits" to the appellees' rivals so as to implicate the other basis for competitive standing: creating marketplace advantage for

---

[5]In *Clarke v. Secs. Indus Ass'n*, 479 U.S. 388 (1987), and *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998), cited along with *Data Processing*, maj. op. 13-14, the Supreme Court addressed only prudential, not constitutional, standing. *See supra* n. 1.

competitors. *Id.*; *See*, *e.g.*, *DIRECTV, Inc. v. FCC,* 110 F.3d 816, 830 (D.C. Cir. 1997) (holding prospective auction bidder had standing to challenge rule that put it at "a substantial competitive disadvantage vis-a-vis other bidders"). As in *McConnell*, because the challenged action neither confers a competitive benefit on competing candidates nor subjects the appellees to any competitive disadvantage, the appellees lack Article III standing.

In *McConnell*, the "Adams plaintiffs" alleged their candidates suffered a "competitive injury" from section 307 of BCRA which increased the ceiling on certain individual contributions, unconstitutionally in their view. As injury they alleged that under section 307 their candidates would be at a " 'fundraising disadvantage' " given that they " 'd[id] not wish to solicit or accept large campaign contributions as permitted by BCRA' because '[t]hey believe such contributions create the appearance of unequal access and influence.' " 540 U.S. at 228 (quoting Adams plaintiffs' complaint). The Court rejected this argument because the candidates' "alleged inability to compete stems not from the operation of § 307, but from their own personal 'wish' not to solicit or accept large contributions, *i.e.,* their personal choice." 540 U.S. at 228. Here too, any competitive injury the appellees may suffer stems not from the FEC's regulations but from their own refusal to take advantage of them. Under the Commission's regulations, the appellees are authorized to employ the same campaign tactics in the same manner as any other federal candidate. The majority attempts to distinguish the Adams plaintiffs' plight by claiming that "because being put to the choice of either violating BCRA or suffering disadvantage in their campaign is itself a predicament the statute spares them, having to make that choice constitutes Article III injury." Maj. op 20. But this is the same "predicament" the Adams plaintiffs asserted: they would be outspent unless they chose to accept the higher hard money contributions authorized by BCRA, which, they maintained, violated the United States Constitution. They

faced their Hobson's choice only because, in their view, BCRA "permit[s] what [the Fifth Amendment] forbids." *See* maj. op. 27. In short, the two appellees have identified no competitive injury they will suffer as a consequence of the challenged regulations; if the FEC "alter[ed] the competitive environment's overall rules," maj. op. 15, it did so for *all* candidates, including the appellees, thereby maintaining a level playing field. Lacking a competitive injury, the appellees' only complaint is of injury to their generalized, abstract interests in enforcing BCRA as they believe it was meant to be implemented and in preventing the appearance or occurrence of corruption. Neither interest supports standing. *See Common Cause v. FEC*, 108 F.3d 413, 418 (D.C. Cir. 1997) (stating court cannot "recogniz[e] a justiciable interest in the enforcement of the law and noting "Congress cannot, consistent with Article III, create standing by conferring 'upon *all* persons . . . an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law,' " (quoting *Defenders of Wildlife*, 504 U.S. at 573) (emphasis original); *Rainbow/PUSH Coalition v. FCC*, 396 F.3d 1235, 1241 (D.C. Cir. 2005) (finding injury from discrimination at local public radio station was insufficient for standing because it was "simply a setback to [an] abstract social interest' in advancing racial equity" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))).

In the absence of either of the two established bases for competitive standing—increased competition and competitive advantage/disadvantage—the only competitive "injury" the majority identifies is the vague, hypothetical and novel "*intensified* competition" injury, maj. op. 14 (emphasis original). Specifically, the majority cites regulations permitting unrestricted coordinated expenditures to be made more than 120 days before an election and relieving non-federal political party committees from allocating expenses for employees devoting less than 25% of their time to federal election activity between federal and non-federal expenditures. These regulations do not,

as the majority states, require the appellees to "respond to a *broader range* of competitive tactics" or to "account for *additional* practices." Maj. op. 14 (emphases added). Even under the appellees' interpretation, BCRA indisputably permits both soft-money-funded coordinated expenditures and use of non-federal committee employees for federal election activity; the regulations simply permit more of these same activities than the appellees believe BCRA authorizes. How these regulations "intensify" the appellees' competition, whether and to what extent rival candidates may avail themselves of the so-called "safe harbors" or their increased use of them will affect the outcome of the appellees' reelection campaigns, is anyone's guess. Notably, neither the appellees nor the majority cites any instance when the safe harbors were exploited to a candidate's detriment in the 2004 election campaigns. In short, the majority's "intensified competition" is precisely the sort of vague and speculative injury that Article III's case or controversy requirement forbids.

Third, the majority's competitive standing theory fails because, as the district court noted, the appellees did not allege a specific competitive injury in their declarations or elsewhere. *See Shays v. FEC*, 337 F. Supp. 2d 28, 45 n.12 (2004); *Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002) (burden is on party asserting standing to "identify in th[e] record evidence sufficient to support its standing").

Finally, the majority is simply wrong if it means to suggest that the two congressmen have standing solely because they are "directly regulated parties," maj. op. 29. The appellees claim injury not from any regulation of their activities under BCRA or the FEC's regulations but rather from the way that other candidates will be regulated (or not). It is clear from the Supreme Court's decision in *McConnell* that injury does not arise automatically from the simple fact of being subject to regulation under a particular regime. As a senator raising funds

to run for reelection, McConnell was plainly "directly regulated" by BCRA. Yet the Supreme Court found he lacked standing to challenge section 305 of BCRA because he failed to carry his burden to "demonstrate an 'injury in fact,' which is 'concrete,' 'distinct and palpable,' and 'actual or imminent.' " *McConnell*, 540 U.S. at 225. The defect noted in McConnell's case was the temporal remoteness of his claimed injury, which related to an election then 6 years off—an unlikely stumbling block for congressmen such as the appellees who are elected biennially. Nonetheless, the treatment of McConnell is relevant here because the Court refused to assume his standing simply because he is "directly regulated" by BCRA. He was still required to point to some specific injury that satisfied all of the standing requirements. The appellee congressmen here are likewise required to identify some specific injury arising from the regulations in order to satisfy Article III's requirements. Because they failed to do so, I would vacate the district court's decision and dismiss this action for lack of standing.[6]

---

[6]I do not agree with the majority that under this view "Shays and Meehan would never have standing to challenge these rules," not even under FECA's judicial review provision, 2 U.S.C. § 437g(a)(8), which permits a private party to challenge in the district court the Commission's decision not to enforce FECA. *See* maj. op. 29. This provision does what BCRA does not; once an actual campaign finance violation has been alleged, it confers on a complainant a procedural right to have the FEC review it. If the FEC offends the right, the party has standing to seek redress in court.